RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0048p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KEVIN A. TOLLIVER,

               *Petitioner-Appellant,*

    *v.*

MICHAEL SHEETS, Warden,

               *Respondent-Appellee.*

No. 08-3177

_____

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 05-01161—George C. Smith, District Judge.

Argued: January 20, 2010

Decided and Filed: February 22, 2010

Before: SUHRHEINRICH, McKEAGUE, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Karen E. Swanson Haan, BAKER & HOSTETLER LLP, Cleveland, Ohio, for
Appellant. M. Scott Criss, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus,
Ohio, for Appellee. **ON BRIEF:** Karen E. Swanson Haan, Daniel R. Warren, BAKER &
HOSTETLER LLP, Cleveland, Ohio, for Appellant. M. Scott Criss, OFFICE OF THE
OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. Kevin Tolliver was convicted in Ohio state court
in 2002 of murdering his live-in girlfriend, Claire Schneider, in the early morning hours
of December 29, 2001. On January 18, 2008, the district court dismissed Tolliver's
petition for a writ of habeas corpus, but certified two issues for appeal: (1) whether
Tolliver's statements to police on the night of Schneider's death were unconstitutionally
obtained and thus were improperly admitted at trial; and (2) whether Tolliver established

1

cause and prejudice for procedural default of an ineffective assistance of appellate counsel claim. We conclude that, while portions of Tolliver's interview with the police were obtained unconstitutionally, the trial court's error in admitting the unconstitutionally-obtained statements was harmless. We also conclude that Tolliver has not demonstrated good cause for procedural default of his ineffective assistance claim. Accordingly, we **AFFIRM** the district court's denial of the petition for a writ of habeas corpus.

## I.

Shortly after 1:00 AM on December 29, 2001, Claire Schneider was shot in the mouth and bled to death on the floor of her apartment in Columbus, Ohio, where she lived with her boyfriend, Kevin Tolliver. Although Tolliver was present in the apartment, he did not call 911, but instead repeatedly called his ex-wife, as well as his voicemail, Schneider's voicemail, and a friend. Police eventually responded to a 911 call from Tolliver's ex-wife, and found Tolliver in the apartment with Schneider, almost entirely covered in blood – except for his hands, which he had washed. Following a three-week trial, a jury convicted Tolliver of murder. In its decision in *State v. Tolliver*, 2004 WL 625683, at *2 (Ohio Ct. App. Mar. 30, 2004), the Ohio Court of Appeals recounted much of the factual background to the case:

> Claire Schneider began dating [Tolliver] in the fall of 1999. [Tolliver] was divorced from his ex-wife, Natasha Tolliver, with whom he shared custody of their young daughter. Claire, a student at The Ohio State University ("OSU") and a part-time nail technician, moved into Apartment 120 in the Olentangy Village Apartment complex located at 100 North Street, Columbus, Ohio, in January 2001. [Tolliver] began living with Claire in September 2001. Claire and [Tolliver] planned to move out of the apartment and into a house, once [Tolliver's] extensive remodeling of the house was completed in January 2002. Claire obtained a loan to purchase the house.
>
> Claire had been accepted into OSU's Program in International Development and was scheduled to study in the Dominican Republic from January 5, 2002 to February 16, 2002. [Tolliver] was scheduled to meet Claire in the Dominican Republic at the conclusion of the program and spend a week vacationing with her. Claire told both her father,

Walter Schneider, and her friend and co-worker, Gail Isenberg Hayes, that she was excited about the upcoming trip. She never mentioned to either of them that she had any plans to marry [Tolliver].

In August 2001, Schneider had gone to Dr. Stanley McCloy complaining of sleeping difficulty, nightmares, panic attacks, and an inability to concentrate. *Id.* Dr. McCloy diagnosed moderate depression and prescribed Paxil. *Id.* Schneider's 30-pill prescription had last been filled on November 24, 2001 – meaning that at the time of her death, Schneider was no longer on Paxil. *Id.* Early in November, Schneider saw Dr. Wendy L. Summerhill, and "mentioned a history of depression and that she had been on Paxil, but that her depression was well controlled." (JA 1304.)

Timothy Flemming, a jeweler who had provided the wedding ring for Tolliver's first marriage, testified that early in December of 2001 he and Tolliver had discussed Tolliver's purchasing a specific type of diamond and platinum engagement ring. Tolliver, Flemming added, was planning to give the ring to Schneider when he went to visit her on her semester abroad. Flemming did not remember giving Tolliver a specific quote or discussing price.

**December 28-29, 2001**

On December 28, 2001, Schneider attended the closing on her new house. Apparently, there were problems with some of the documentation, and it is not clear whether the transaction was completed. *Tolliver*, 2004 WL 625683, at *2. Hayes, Schneider's co-worker and good friend, testified that, on the 28th, Schneider had no bruises or abrasions on her hands, face, or neck. Schneider, Hayes added, was "very stressed" about "the house situation that her and Kevin were involved with," had been "a little emotional" during the previous five days, and "was upset earlier in the day [of the 28th]." (JA 1103-04.)

That evening, around midnight, Scheider and Tolliver had drinks at a restaurant with a friend and later went to the Krome nightclub. *Tolliver*, 2004 WL 625683, at *2. Abby Warner, one of Schneider's co-workers, testified that at Krome she had seen Schneider and Tolliver dancing with each other, "hanging onto each other, looking into

each other's eyes, look[ing] like they were having fun." (JA 1406.) Later in the evening, however, Warner saw Schneider dancing, without Tolliver, in a large group of people, and Tolliver looking down at her from a higher level, "watching her with his arms across his chest" and looking "kind of angry." (JA 1407.) Collin Bumgarner, a worker at Krome, testified that on the night of Schneider's death he saw Tolliver and Schneider as they were exiting the club, and that in the parking lot they were speaking particularly loudly. While the discussion drew his attention, Bumgarner added, it was not alarming – either to him or to the police officers with whom he was standing.

> [Tolliver] and Claire returned to the apartment at approximately 12:36 a.m. . . . . At 1:15 a.m., Janet Parady, who resided in Apartment 220, was awakened to a man screaming "No, No. Don't, don't. Oh, please. Please." (Vol.I, Tr. 76.) She called 911 and reported that she thought the screaming came from Apartment 320, the apartment directly above her. She further reported that the people who lived in apartment 320 had been fighting for approximately one-half hour, and that it sounded like someone had fallen down.

*Tolliver*, 2004 WL 625683, at *2 -*3. In fact, Tolliver and Schneider lived in the apartment (120) *below* Parady. A police officer responded to Parady's call, but found nothing wrong at apartment 320. He did not check apartment 120.

> At approximately 1:45 a.m., Natasha Tolliver received a telephone call from [Tolliver]. [Tolliver] was sobbing and told Natasha that if she ever loved him, she would come to his apartment immediately. Natasha put her daughter in her car and drove to the apartment complex at approximately 1:55 a.m. When she arrived at [Tolliver's] apartment, she saw blood smeared on the front door. [Tolliver] was dressed in a blood-stained bathrobe and had blood on his hands and legs. She also noticed blood on the living room wall and kitchen floor. Natasha told [Tolliver] she was going to take their daughter back to the car. [Tolliver] followed her outside. When she asked [Tolliver] what had happened, he told her that he was "really in trouble." (Vol.XII, Tr. 1727.) Natasha told [Tolliver] to call the police. [Tolliver] was crying so hysterically that Natasha thought he was having a breakdown. [Tolliver] said he was going to kill himself and that he wanted to see his daughter. Natasha called 911 and reported what had happened. She then drove to the other side of the parking lot because she was afraid [Tolliver] might kill himself in front of their daughter.

Peter Kovarik, the resident of Apartment 215, returned to the apartment complex at approximately 2:00 a.m. As he walked inside the building, he noticed [Tolliver], dressed in a bathrobe, standing in the hallway outside Apartment 117. [Tolliver] seemed startled to see Kovarik and ducked into the alcove outside Apartment 117. Seconds later, [Tolliver] stepped out from the alcove and asked Kovarik "how's it going?" (Vol.I, Tr. 107.) In response, Kovarik asked [Tolliver] "how is it going with you?" [Tolliver] responded "good." (Vol.I, Tr. 108.) According to Kovarik, [Tolliver] did not act as if he were upset about anything and did not ask him for assistance.

Officers [David] Shots and Paul Coulter responded to Natasha's 911 call between 2:00 and 2:05 a.m. . . . [and] the officers proceeded to [Tolliver's] apartment. [Tolliver] emerged from the apartment, dressed only in a bathrobe. The bathrobe had blood on it, as did [Tolliver's] feet and legs. [Tolliver] was talking on a cell phone (later determined to be Claire's) and holding a bloody dishtowel. [Tolliver] told the officers, "[s]he shot herself." (Vol.I, Tr. 149.) According to both Shots and Coulter, the door to Apartment 117 had smeared blood on it, as if someone had tried to wipe blood off the door. There was also blood spatter on the door jamb of Apartment 117. [Tolliver] was immediately handcuffed and placed in Shots' cruiser.

*Id.*

Officer Shots testified that, while Tolliver was sitting in the cruiser, Tolliver, unprompted, said "I can't believe she did this. She has only held a gun - - she has never even held a gun." (JA 0314.) Tolliver then "said they were at the mall earlier, something about they closed on a house or looking to buy a house," (JA 0314), and also said "something about that the phone didn't work in his apartment . . . or it didn't have a phone in his apartment," (JA 0315).

While searching the apartment, Officer Coulter found blood on the walls and floor, as well as on several items in the apartment. An overturned floor lamp and potted plant lay on the living room floor. Coulter discovered Claire's dead body lying face-up on the bathroom floor on top of a black nylon jacket. Her arms were partially inside the sleeves of the jacket, which was saturated with blood. A blood-covered 9mm Ruger semiautomatic pistol, an envelope containing $3, and a handwritten note were found on the vanity in the bathroom. The note said "she did not know gun was loaded. I loved her. Could not find the phone." (Vol. II, Tr. 308, State's Exhibits D120, D121, E12.) Inside the sink lay two live

shells and the gun's magazine clip containing 12 live shells. The gun did not contain a live round in the chamber. The bathroom door contained a single bullet hole that had several strands of hair attached to it. A spent 9mm shell casing was found in the hallway just outside the bathroom. A spent 9mm bullet was found behind the door in the bathroom. Two pens and a semiautomatic weapon magazine clip containing live rounds of ammunition were found underneath Claire's body.

Columbus Police Detective Robert Viduya . . . instructed the transport officers not to allow [Tolliver] to go to the bathroom at the police station, so that blood evidence on [Tolliver's] body could be collected. Photographs taken of [Tolliver] at the police station show blood on [Tolliver's] face, legs and feet; however, no blood appears on [Tolliver's] hands.

*Tolliver*, 2004 WL 625683, at *3-*4.

**The Videotaped Interview**

After Tolliver was taken to the police station, the police conducted a videotaped interview during which Tolliver – while never incriminating himself – made a number of statements that the prosecution later used at trial to cast doubt on his credibility.[1] Tolliver repeatedly stated that Schneider had killed or shot herself, and that he and Schneider: had just bought a house together; were not having any problems or fights; and were getting engaged and were planning their wedding. Additionally, Tolliver made the following statements:

---

[1]On May 2, 2002, the trial court denied Tolliver's motion to suppress the statement, concluding that, while Tolliver was in custody, he was not being interrogated within the meaning of *Miranda v. Arizona*, 384 U.S. 436 (1966). The court explained:

It is the Court's interpretation . . . that the Defendant wanted to assert or argue that the victim had committed suicide and wanted to assert or argue that if the Detective would only look at the evidence, they would see how ridiculous it would be for anyone to assume that he committed the homicide.
    Each time the detective attempted to advise the Defendant of his rights, he would interrupt making such statements as "the minute you start to advise me of my rights I'm going to stop talking" or words to that effect. The court does not feel that the statements made by Detective Viduya raised themselves to the level of an interrogation.
    It is this Court's definite impression that the Defendant Tolliver did not want to be questioned by the detective and therefore did not want to specifically waive his rights, however, he did want to assert his position and argue his perception of evidence to the detective, without being questioned. . . . [T]he video and/or statements of the Defendant should probably end at the time he names the three attorneys and the detective leaves the room to call one of them.

(JA 2151-53.)

"I just bought a $7500 diamond engagement ring."

"We were naked, and we were about to make love . . . ."

"That's why I couldn't call anybody faster, I spent 20 minutes running through the house looking for my phone. I couldn't find it. I finally found hers."

"I was trying to see my daughter, so I did wash [off some of the blood]."

"I wanted to see my daughter, because I wanted to kill myself."

"She had not taken her medication [Paxil]. She was upset about her family and their dislike for me and that she might be pregnant."

"I was in the bathroom by myself when she came in. I was getting the other gun out, and I was taking them out of the house."

"She was in the middle of a sentence when she accidently shot herself. . . . She said, 'What do you want me to - -' pow."

"I could feel her jaw, felt like it was broken but I couldn't find the entryway."

"I went across the hall, banged on the door . . . . there was nobody home."

"We were going to the Dominican Republic for two months . . . ."

"If you can find any residue or gun powder on my hands . . . then you can come and you can ask me questions beyond that you want to [*sic*]. Forensics will show you that I did not pull any triggers.";

Tolliver also asserted several times that he was "not of sound mind," and so was not in a position to waive any of his rights. While Tolliver himself did not testify at the trial, the prosecution showed the jury an edited version of the statement.**[2]**

**Additional Trial Testimony**

Keith Norton, a forensic pathologist and deputy coroner at the Franklin County Coroner's office, performed an autopsy on Schneider. Norton found numerous bruises and abrasions on Schneider's body, including two on the front of her right leg, three on the inside of her right leg, one close to her right ankle, and three on the outside of the left

---

**[2]**When the video of the interview was shown to the jury, the prosecution removed (or muted): shots of Tolliver naked; references to whether Tolliver had ever been issued the *Miranda* warning; Tolliver's declarations that he would remain silent once issued a *Miranda* warning and that he was not of sound mind; Tolliver's response that he would help police on the investigation; Tolliver's demand that he be placed alone until he could talk to his attorney; and Tolliver's statement that he did not want to talk to police, but wanted them "to clearly understand what happened."

upper leg. There was a bruise on the base of Schneider's right thumb, on the back of the hand, that Norton testified was consistent with (but not necessarily) a defensive wound. There was also swelling and bruising of the left side of the face close to the eye. In addition, there were two narrow "scratch-like" scrapes on the right side of the chest, and there was an abrasion with the bruise on the left side of her neck. While the bruises were of different colors, Norton testified that he was not able to say when they had been caused, as determining the age of bruises is "not science," but is rather "like reading tarot cards." (JA 0855.) Most tellingly, Norton testified that he had found that Schneider's lips on the right side of her mouth were burned, and that there was a small circular area on the upper lip in the middle of this burned area that "was relatively spared, more nearly normal in color." (JA 0807.) Norton also testified that Schneider's front teeth were intact – meaning that the bullet entered her open mouth.

Norton stated that the fact that the gun was outside of Schneider's mouth when it was discharged suggested to him that it was not suicide. Ultimately, however, Norton was not able to conclusively determine the manner of Schneider's death (as homicide or suicide), and instead recommended that the coroner rule the manner of death "undetermined." As Norton explained, "[t]he major consideration of whether this was a suicide and unable to determine that decision, I went ahead with an undetermined ruling. That is what I recommended to Dr. Lewis, the Coroner, and Dr. Lewis went along with that." (JA 0946.) Norton also testified that his autopsy findings were not inconsistent with CPR having been performed. *Tolliver*, 2004 WL 625683, at *5.

> [Columbus Police Detective and bloodstain expert Robert] Young also noted 18 impact spatterings on the right forearm of [a]white shirt found in the clothes hamper. According to Young, the entrance wound in Claire's mouth produced high velocity back spatter, which landed on the right sleeve of the shirt, demonstrating that the shirt was in close proximity to Claire's face at the instant she was shot. Impact droplets in the button line on the front of the shirt indicated that the shirt was worn unbuttoned at the time of the spattering. Young candidly admitted that he did not think the shooting was a homicide until he saw photographs of the shirt. Young conceded that expirated blood from Claire's mouth or nose expelled during CPR might appear as high velocity spatter, but he did not believe that the bloodstains on the shirt were expirated. Young

> concurred in Norton's opinion that the fact that only Claire's back teeth sustained damage indicated that her mouth was open at the time she was shot. Young agreed that the blood spatterings found on the shirt are consistent with the theory that someone fired the gun with the left hand while holding Claire by the throat with the right hand. Young conceded, however, that the blood spatter evidence did not provide a direct indication of who fired the gun.

*Id.* at *6.

Mark J. Hardy, a criminalist with the Columbus police and an expert in firearms evaluation, testified that Schneider's lips had probably been burned by the gasses that emerged from the gun when it was fired, and that the unburned area on her lips probably indicated that part of the muzzle of the gun was pressed against her mouth, and so protected her lips from the heat. This would mean that the gun was not inserted into Schneider's mouth, but rather fired from just outside of her mouth. Hardy concluded that the gun had been positioned on its side with the butt of the gun facing to Schneider's "left as you are looking at her." On cross, Hardy agreed that "the exact features" he had described "could have been produced by Claire holding the gun close to her face and pulling the trigger." (JA 1578; 1585.)

> Defense bloodstain expert Stuart James determined that Claire was standing no more than 6 to 12 inches from the bathroom door when she was shot. With regard to the bloodstain spatters on the white shirt, James concluded that it was impossible to state with scientific certainty whether the spatters were produced by gunshot back spatter.
>
> Claire's cell phone records demonstrate that between 1:29 and 2:15 a.m. on December 29, 2001, seven calls were made to Natasha Tolliver's cell phone, one call was made to Claire's cell phone, one call was made to defendant's cell phone, and one call was made to a friend of defendant.

*Tolliver*, 2004 WL 625683, at *7.

One of the prosecution's key witnesses was Joseph Adams, an inmate who had been incarcerated with Tolliver, who testified that Tolliver confessed to killing

Schneider.**3**   Adams was in prison for eight counts of bank robbery, one count of

possession of cocaine, and one count of kidnapping.  Previously, he had been convicted

of manslaughter and theft of a credit card.  After Adams discovered that Tolliver had

been charged with murder, he decided to try to coerce Tolliver into revealing details

about the murder so that he could then provide that information to the state in exchange

for a reduction in his sentence. *Tolliver*, 2004 WL 625683, at *7.  Adams was serving

a 16-year sentence, and in exchange for his testimony against Tolliver his sentence was

cut in half.

According to Adams, Tolliver had said that he felt as though he would be losing

Schneider if she went on her study abroad.  Tolliver "just couldn't take" Schneider

traveling to the Dominican Republic, Adams added.  (JA 1425.)  After Tolliver shot

Schneider, moreover, Adams testified, Tolliver "had to get rid of some evidence."  (JA

1425.)

> He shot her with a sock over his wrist, a shirt, like a towel over the rest
> of his arm when he shot her, to keep the gun blast from going back.  He
> had to get rid of that evidence.  He had to move her around to make it
> look like she killed herself.  He wanted to get blood on him from her to
> make it look like he was holding her, and that was the state of shock he
> was in, and eventually he called the authorities.

(JA 1425.)  Tolliver's defense strategy, Adams explained, would be to tell the jury that

Schneider had killed herself, "and when they saw him on the stand and saw him cry and

really look remorseful, then they would know that he didn't kill her himself, his exact

words."  (JA 1427.)

> An inmate incarcerated with [Tolliver] and Adams, David Dye, testified
> on behalf of [Tolliver].  According to Dye, Adams approached him prior
> to [Tolliver's] trial and asked him if he wanted to testify against
> [Tolliver] in order to "help myself (Dye) out." (Vol.XII, Tr. 1670.)  Dye
> told Adams that he could not testify against [Tolliver] because he did not
> know anything about [Tolliver's] case.  He further stated that although

---

**3**Adams admitted that when he first met Tolliver he had threatened to assault Tolliver with three
bars of soap wrapped in a sock – an admittedly deadly weapon – because Tolliver had received a desirable
cell.  It was only later, Adams explained, that he won Tolliver's trust and friendship.

Adams never told him he had made up the story about [Tolliver], Dye got the impression that Adams had done so.

*Tolliver*, 2004 WL 625683, at *1 -*7.

**Use of Tolliver's Statement During Opening and Closing Arguments**

Having showed the jury the video of Tolliver's statements to the police, the prosecution spent a good deal of time discussing the import of Tolliver's words. Before showing the video, the prosecution first informed the members of the jury that they were going to hear Tolliver claim that he could not find a phone, despite the fact that a cell phone was right there in the apartment. The prosecutor focused at greater length on the statement in her closing statement:

> You have heard all of the evidence. Nothing in the evidence, other than the word of the defendant, supports the fact that Claire Schneider killed herself. Nothing. The evidence does support the fact that the defendant murdered Claire Schneider. Not only was Claire Schneider murdered by the defendant, he then compounded it by telling the police that she killed herself, compounded the horror and made it worse.
>
> * * *
>
> Everyone who saw Claire that day, every single person said she acted normal, appeared to be in a good mood, she was fine. You heard the tape of the defendant. The defendant lied. The defendant told you several lies in that video. I'm certain you caught many of them, and they all make sense now. He told you he spent 20 minutes running through the house looking for his phone.
>
> First of all, you heard his phone was right outside at his [car], a few feet from the door. . . . His keys are laying right there. They are in the pictures. If he was looking for Claire's phone - - Gail told you she kept it in her purse. The purse was laying right in open sight. He was waiting for Claire to die. Gee whiz. If I call the police before she was dead, I can't say she did herself, because what if she makes it? What if she can talk? He said, "We have just closed on a house today together. The mortgage was all in Claire's name." Control? Who had the obligation for that mortgage?
>
> "I just bought a $7500 diamond engagement ring." His own witness told you not only had he not bought a ring, they hadn't even talked prices of rings. They had had a conversation, one conversation about rings. He

said we were not having any problems. You heard how loudly they were arguing across the street from Krome; you heard how he was glaring at Claire at Krome. No problems.

You heard him over and over and over say "Check me for gunpowder. Check me for gunshot residue. The forensics will clear me. Check me." Check me," the man with clean hands when the police showed up. "Check her for gunshot residue." Of course, she had it on her hands. She should have had it on her hands. You would expect her to have it on her hands because she was in the room. You heard that. We were planning our wedding tonight.

That's funny, because Gail told you that Claire - - if she were engaged in their wedding plans - - her wedding or even talking about it, she would have called Gail immediately and told her. She shared everything. Gail had never heard anything about that. Neither had her father.[4]

"I should have just killed myself right there. I just had to see my daughter first." You saw it on video. He saw his daughter. If that were a true statement, look how much time he had. Child came out of the building at two o'clock. The police went into the building at 2:14. He had 14 minutes. Put the clip in and pull the trigger if you really were going to kill yourself. You had gotten to see your daughter. He didn't have any intention of killing himself. He was going to leave. Read the note.

"Claire and I rented the apartment." Not only was his name not on the lease, he had his attorney call them up and say he didn't live there.

Talks more about trying to find a phone. Can't find a phone.

\* \* \*

He talks about her being in the middle of a sentence. "What do you want me to - -" Does that make sense? Any sense whatsoever? I was in the bathroom by myself when she came in. I was getting the other gun out, the other gun that is stowed away safely in the bathroom closet. The door wasn't open to the closet. The gun was still there tucked away on

---

[4]Tolliver argues, as part of the claim that state courts found to be procedurally defaulted, that his attorney was ineffective in that she did not insist that he be present for a hearing into whether Schneider's diary would be admitted at trial. The defense had asked for access to the diary, but the judge – as he later affirmed – never ruled on the request. (The judge added that he did "not recall whether he gave defense trial counsel an opportunity to review the diary." (JA 2184-85.)) The diary, which was in the prosecution's possession, seems to contradict directly the prosecution's assertion that Tolliver and Schneider had no plans to marry. One entry in the diary, for example, dated 10-1-01 (almost three months before Schneider's death) reads: "Going to the chapel and we're going to get **Married**! Mrs. Claire Tolliver. Mrs. Claire Tolliver. Mrs. Claire Tolliver. I am sooo in LOVE with my man it's unbelievable. We decided that we're just gonna say "FUCK IT"!!! and go get married @ the courthouse." (Pet. Mot. for Expansion of COA, 6/26/08, Ex. C.)

a shelf. He wasn't getting it out. He was getting them there. He wasn't getting them out of the house.

He told you her jaw felt like it was broken, but Dr. Norton said, Huh-huh. It didn't feel like that. Bullet went through soft tissue.

He tried to tell you he banged on the door across the hall, the door across the hall that Joe Swick knew was not occupied at the time. He knew that, because there was junk mail. The people were out of town.

* * *

He said we were going to the Dominican Republic, starting for two months in January. You know that's not true. Claire had a ticket. Claire was leaving. Claire was getting away from him, and he didn't like it. He was not going. He was going to visit her at the very end of her trip. He said, "I put the clip in." The second shot would have been fired. The clip was not in the gun.

And then he said he wanted to spend some time with the daughter before the police showed up. He didn't realize we knew he had already spent time with his daughter. We had it on video.

(JA 1933-1957.) The transcript of the prosecution's closing argument runs for 24 pages; of that, approximately 4-5 pages (or between 16% and 20% of the total) includes commentary about Tolliver's statements.

Following the defense closing argument, the prosecution on rebuttal once again focused on Tolliver's statements, and began by focusing on one statement in particular:[5]

One simple way for you to know whether Kevin Tolliver lied, simple, twice in the tape and has been repeated by Mr. Reinhart [Tolliver's attorney] himself, he said that Claire Schneider said, "What do you want me to - -" twice, in the tape, "What do you want me to - -" and I want all of you to say, "What do you want met to - -" Where are your teeth when you finish? "What do you want me to - -" Now, I want you to scream, "No." I want you to scream "No," like somebody is trying to kill you.

---

[5]The parties discussed the importance of the videotape during a sidebar following the prosecution's case. The defense had moved for a judgment of acquittal, arguing that the evidence (apart from the testimony of Adams) was at the very best equivocal. The prosecution stated: "obviously we think . . . there is evidence. We will agree that is largely - - perhaps completely a circumstantial case, however, the fact that the defendant made a statement to - - the jury has heard and they have heard that there were several untruths or inconsistencies in that tape is also evidence; and, therefore, it should be submitted to the jury." (JA 1649.) In other words, the prosecution believed that its case deserved to go the jury because of Adams's evidence and Tolliver's statement. The judge agreed that there was enough to go to the jury without Adams, and that with Adams there was even more justification.

"No, no. Please don't." How far away are your teeth? This bullet went between her teeth. It's not possible. "What do you me to - -" bullet wouldn't fit. Absolutely, would not fit. He lied.

He lied about other things. He said they were naked. They weren't naked. Claire was wearing a coat. . . . And all she had on under it was one skimpy pair of underwear. How much of a hurry do you have to be in to only put on a coat and those underwear if you are leaving? Pretty big hurry.

* * *

He [Tolliver's attorney] said that Kevin Tolliver never used the word "suicide." He is right, but what did he say? You couldn't have been this upset. So she was supposed to be taking Paxil. She hadn't taken her medication. She was upset about her family. What if she didn't mean it? He didn't suggest suicide. Absolutely. He couldn't get his story straight. He said suicide, accident, suicide, accident. He couldn't keep his story straight.

* * *

Was he afraid he would get accused of something he didn't do? Or was he afraid of the fact that a lot of his story didn't make sense? Does a distraught person say, "I'm not psychologically sound of mind"? That is not possible. Are those the statements of an innocent man?

(JA 1999-2000, 2005-06, 2010.)

The jury found Tolliver guilty on June 4, 2002, and the judge sentenced Tolliver to serve 15 years to life, with an additional three years added on through a firearm specification.

**Procedural History**

After Tolliver appealed the conviction, the Ohio Court of Appeals in the Tenth Appellate District affirmed the judgment on March 30, 2004, addressing at length Tolliver's arguments about the admissibility of his statements to police. After dissecting Tolliver's statement, the court concluded that Tolliver had not been subjected to "interrogation" at the time he made his statement, and so the statement was not made in violation of *Miranda*. The court also concluded that most of the police questions were merely permissible follow-ups to Tolliver's volunteered statements, and that Tolliver

had repeatedly interrupted police attempts to give the *Miranda* warning. *Tolliver*, 2004 WL 625683, at \*16. While conceding that one police comment, regarding the location of Schneider's wound, *did* constitute "express questioning in violation of *Miranda*," the court held that admission of Tolliver's response was harmless. *Id.* The court also concluded that Tolliver's demand during the statement that the detective "stop talking" and "find me someplace where I can be by myself . . . until I can see my attorney" was, moreover, so equivocal a request for an attorney as not to trigger the Fifth Amendment right to counsel. Even if it were an invocation of the right to counsel, the court added, "admission of the statements following the request was harmless, given that defendant had already made similar statements, or other admissible evidence confirmed those statements." *Id.* at \*17. The Ohio Supreme Court declined jurisdiction and dismissed the appeal on August 4, 2004. The Ohio Supreme Court then denied Tolliver's motion for reconsideration on September 29, 2004.

On December 28, 2004, acting pro se, Tolliver asked the Ohio Court of Appeals to reopen his direct appeal so that he could argue that his counsel was ineffective for failing to identify Adams as a state agent and failing to ensure that Tolliver was present at the trial court hearing concerning admission of Schneider's diary. Tolliver filed this motion 90 days after the Ohio Supreme Court made its final ruling on his direct appeal, and more than nine months after journalization of the Court of Appeals opinion. On May 6, 2005, the Ohio Court of Appeals denied Tolliver's motion, concluding that Tolliver had procedurally defaulted his claim by failing to file his application within 90 days after journalization of the appellate judgment and failing to show good cause for the untimely filing. On May 17, 2005, more then ten days after this judgment, Tolliver moved for reconsideration. The Ohio Court of Appeals denied on June 23, 2005, concluding that Tolliver had failed to meet the requirement that applications for reconsideration be filed within ten days. Nonetheless, the court reached the merits, and affirmed its previous ruling, concluding that the fact that Tolliver's post-conviction petition was still pending before the Ohio Supreme Court was not adequate "good cause" justifying missing the deadline. The Ohio Supreme Court declined jurisdiction on August 10, 2005.

Even while pursuing his direct appeal, Tolliver initiated post-conviction appeals, petitioning the trial court to vacate or set aside his conviction and sentence, arguing a combination of actual innocence and ineffectiveness of counsel. On May 7, 2004, the court declined to do so. The Ohio Court of Appeals then affirmed on March 8, 2005. The Ohio Supreme Court declined jurisdiction on August 10, 2005. Following the failure of these state appeals, Tolliver on December 23, 2005, petitioned for a writ of habeas corpus in federal court, alleging numerous grounds for relief. On November 20, 2007, the magistrate judge recommended that Tolliver's petition be dismissed. The district judge adopted the magistrate judge's recommendation in full, but construed Tolliver's notice of appeal as a request for a certificate of appealability, and certified two issues for appeal:

1. Were petitioner's statements to police unconstitutionally obtained and thus improperly admitted at trial?

2. Did petitioner establish cause and prejudice for his procedural default of his ineffective assistance of appellate counsel claim?

**II.**

We first address whether Tolliver's statements to police were unconstitutionally obtained and thus improperly admitted at trial – and, if so, whether the trial court's error in admitting these statements was harmless. Tolliver argues that the trial court admitted statements that were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966) through: (1) express questioning prior to the issuance of a *Miranda* warning; (2) questioning following Tolliver's declaration that he wished to remain silent; and (3) questioning following Tolliver's demand that police stop talking until he could see his attorney. We find that while many of Tolliver's statements were voluntary, the police eventually began interrogating Tolliver within the meaning of *Miranda,* and continued the interview and interrogation even after Tolliver invoked his right to counsel. The prosecution then used Tolliver's unconstitutionally-obtained statements at trial to cast doubt upon Tolliver's credibility. As the prosecution's references to these unconstitutionally-obtained statements were merely cumulative, however, we also find that the trial court's error in admitting these statements was harmless.

In reviewing a district court's denial of a petition for a writ of habeas corpus under 28 U.S.C. § 2254, we review all legal conclusions de novo. *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court shall not grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under the first, "contrary to," clause, a federal habeas court may grant the writ "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under the second, "unreasonable application," clause, a federal habeas court may grant the writ "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* In order for a writ to issue, we must determine *both* that the state court incorrectly applied the relevant Supreme Court precedent and that this misapplication was objectively unreasonable. *Id.* at 411.[6]

## A.  Unconstitutionality

Under the Fifth Amendment, a suspect is guaranteed the right to remain silent and the right to assistance of counsel during a custodial interrogation. *Miranda*, 384

---

[6]We may look to decisions by other circuits not as binding precedent on whether a legal principle has been clearly established by the Supreme Court, but rather to inform the analysis of Supreme Court holdings to determine whether a legal principle had been clearly established. *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003). We are bound by prior Sixth Circuit determinations that a rule has been clearly established. *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004).

U.S. at 444-45.   Early in the *Miranda* opinion, the Supreme Court summarized its holding:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the  process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

*Id.*  In 2000, the Court reaffirmed the rule that the prosecution may not use statements obtained through custodial interrogation in the absence of the specific rendering of the *Miranda* warning.  *Dickerson v. U.S.*, 530 U.S. 428, 432 (2000); *see also Oregon v. Elstad*, 470 U.S. 298, 317 (1985).  "Interrogation" includes "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).  The "functional equivalent" of express questioning includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Pennsylvania v. Muniz*, 496 U.S. 582, 600-01 (1990) (citing *Innis*, 446 U.S. 291).  Police must "scrupulously honor" a suspect's "right to cut off questioning."  *Michigan v. Mosley*, 423 U.S. 96, 103 (1975) (quoting *Miranda*, 384 U.S. at 479).  In other words,

regardless of whether police are interrogating a suspect in custody or of whether the suspect has waived his *Miranda* rights, police must respect that suspect's invocation of his Fifth Amendment rights to remain silent or to counsel.

In this case, the government concedes both that Tolliver was in custody and that the police did not successfully administer a *Miranda* warning. The questions for us, then, are whether: (1) the police interrogated Tolliver; (2) Tolliver ever invoked his right to remain silent; or (3) Tolliver ever invoked his right to counsel. While Tolliver interrupted police attempts to administer the *Miranda* warning, volunteered numerous statements, and was unclear as to whether he was invoking his right to remain silent, we find that at times the police crossed the line into "express questioning or its functional equivalent" and that, prior to the end of the interview, Tolliver unambiguously invoked his right to counsel.[7] In other words, the statements police obtained from Tolliver following the initiation of interrogation and Tolliver's invocation of the right to counsel were obtained in violation of Tolliver's Fifth Amendment rights; the trial court thus erred in admitting those statements at trial.

### 1.     Police questions about Tolliver's "wire" phone.

Tolliver points first to two police questions (regarding his home phone and number), asked early in the interview, that he argues were "express" inquiries violating *Miranda*. While the two questions were clearly "express" in the sense that the police explicitly asked Tolliver what his home phone number was and whether he had a "wire phone" in his apartment, however, the transcript and the video of the interview both make clear that the police here were simply trying to follow up on *Tolliver's* request that the police contact Schneider's parents to tell them about Schneider's death. After Tolliver made this request, the police asked whether Tolliver knew Walter Schneider's number. When Tolliver replied that the number was "in the cell phone that [police] took

---

[7]At oral argument, Tolliver's counsel argued that the *entire* interview was conducted unconstitutionally because, prior to any questioning, Detective Viduya told Tolliver that he wanted to "do an interview." (JA 31.) By merely telling a suspect that they want to interview him or ask him some questions, however, the police are of course not engaged in "express questioning or its functional equivalent," and so are not interrogating that suspect within the meaning of *Miranda*.

from me at the scene," the police observed that they thought the cell phone was still at Tolliver's apartment. It was only *then* that they asked Tolliver what his telephone number at home was, and whether he had a "wire phone" in the apartment. Despite the importance to this case of whether Tolliver could find a phone in the apartment, the police were in fact following up on Tolliver's voluntary statement and were seeking an easy way to call over to the apartment to have the police there check on the phone number. *See Tolliver*, 2004 WL 625683, at *15. We therefore find that by asking these questions the police were not interrogating Tolliver within the meaning of *Miranda*.

> **2.     Tolliver's statements that he did not want to talk or want to waive his rights.**

Tolliver next claims that, following the police questions about his home phone, he three times affirmatively invoked his Fifth Amendment right to remain silent. According to the transcript, just as Detective Viduya was preparing "to go over this rights waiver," Tolliver broke in:

> THE DEFENDANT:  Let me tell you something.
>
> THE OFFICER:  I am going read it (inaudible).
>
> THE DEFENDANT:  I am going to tell you right now, okay?
>
> THE OFFICER:  Okay.
>
> THE DEFENDANT:  **[1] I am not of sound mind or - - I am not capable of waiving anything right now.**  I will give you any verbal statement to give you all of the information you need to investigate, but **[2] I am not going to sign off on anything that has to do with my rights.**  If you don't want to hear what I have to say, fine.  But she is the only one with gun powder on her, okay.  It was my fault for bringing the gun out.  But I was in the bathroom by myself when she came in.  I was getting the other gun out, and I was taking them out of the house.  She had not taken her medication.  She was upset about her family and their dislike for me and that she might be pregnant.  And beyond that - - and beyond that, we had no problems.  We were out with friends.  We were discussing our wedding, and I just lost my whole world
>
> *  *  *
>
> THE OFFICER:  I understand that you don't want to give a statement, but for the record I am going to go over it with you.  Who knows, you might change your mind.  I am going to advise you of it, okay?

THE DEFENDANT: You can advise me. I am telling you right now, that - -

THE OFFICER: I am just going to do the procedure and then, you know, after that, you can decide on what you are going to do.

THE DEFENDANT: **[3] You say that I have the right to remain silent. I will be silent. You can get any information that you need for this investigation. Before that. The minute you say it, I have nothing more to say to you.**

(JA 46-47 (emphasis added).)

Suspects of course have the right to invoke their right to remain silent. As the Supreme Court explained in *Miranda*:

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

384 U.S. at 473-74. That said, however, even if a suspect has invoked his right to remain silent, any information he then *volunteers* is admissible, provided it did not result from further interrogation. *See id*. at 478 ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."). It is hard to construe Tolliver's first two statements, that he was not capable of or interested in waiving his rights, as invocations of his right to remain silent.[8] Regardless, even if he did invoke his right to remain silent with these two statements, he immediately (and without police prompting) volunteered additional information. He cannot have it both ways: if he wanted to invoke his *right* to remain silent, he then needed to *remain* silent.

---

[8]The parties indicate that Tolliver's ambiguous comments regarding his mental state and his intention not to sign off on his rights might raise the question of whether the requirement in *Davis v. U.S.*, 512 U.S. 452, 457 (1994), that a suspect "unambiguously" invoke his Fifth Amendment right to counsel similarly applies to an invocation of the Fifth Amendment right to remain silent. We have never explicitly reached this question, *see Thompkins v. Berghuis*, 547 F.3d 572, 583 n.4 (6th Cir. 2008), and need not do so in this case because, even if Tolliver invoked his right to remain silent, he volunteered further statements without additional police prompting.

Tolliver's third statement, that he was not going to exercise his right to remain silent until he was informed that he had that right, simply cannot stand as an invocation of the right to remain silent. To the contrary, Tolliver was clearly stating that he had *not* invoked his right to remain silent, but that he *would*. Tolliver apparently believed that he could volunteer information to the police while retaining his right to remain silent, because he had prevented Viduya from administering the *Miranda* warning. Tolliver was, of course, incorrect. Moreover, we share the state trial court's "definite impression" that Tolliver wanted "to assert his position and argue his perception of evidence to the detective, without being questioned." (JA 2151-53.) Accordingly, we find that Tolliver's statements following Tolliver's comments about waiving his rights or remaining silent were not obtained unconstitutionally, but were instead volunteered.

### 3.     Detective Viduya's mention of "more than one gun in the place".

Tolliver next argues that, by declaring that he needed to know whether there was "more than one gun in the place," Detective Viduya was attempting to elicit information from Tolliver and so engage in the "functional equivalent" of express questioning within the meaning of *Innis*, 446 U.S. 291, and *Muniz*, 496 U.S. at 600-01. Viduya's statement closely followed Tolliver's statement that he would remain silent once he was informed that he had that right:

> THE DEFENDANT: I am not of sound mind or - - I am not capable of waiving anything right now. . . . It was my fault for bringing the gun out. But I was in the bathroom by myself when she came in. **I was getting the other gun out**, and I was taking them out of the house. She had not taken her medication. She was upset about her family and their dislike for me and that she might be pregnant. And beyond that - - and beyond that, we had no problems. We were out with friends. We were discussing our wedding, and I just lost my whole world.
>
>                              * * *
>
> THE OFFICER: I understand that you don't want to give a statement, but for the record I am going to go over it with you. Who knows, you might change your mind. I am going to advise you of it, okay?
>
> THE DEFENDANT: You can advise me. I am telling you right now, that - -

THE OFFICER: I am just going to do the procedure and then, you know, after that, you can decide on what you are going to do.

THE DEFENDANT: You say that I have the right to remain silent. I will be silent. You can get any information that you need for this investigation. Before that. The minute you say it, I have nothing more to say to you.

THE OFFICER: I can't ask you anything pertinent to the investigation without me advising you of your rights first (inaudible). **You just mentioned a gun. I don't know if it's more than one gun in the place, stuff like that I need to ask you but -**

THE DEFENDANT: I am willing to share all this information with you because I have nothing to hide; however, I am not of sound mind. She was in the middle of a sentence when she accidently shot herself. I feel it was my fault, because she didn't know the gun was loaded. She said, "What do you want me to - -" pow. I turned around and she was falling at my feet. I have nothing - -

(JA 47-48 (emphasis added).)

The line between impermissible interrogation and permissible follow-up questions to volunteered statements is a fine one. Police may listen to volunteered statements, and need not interrupt a suspect who is volunteering information in order to deliver a *Miranda* warning. *See Miranda*, 384 U.S. at 478. Police may even interrupt a volunteered statement to ask clarifying or follow-up questions. *See, e.g.*, *U.S. v. Rommy*, 506 F.3d 108, 132-33 (2d Cir. 2007) (collecting cases); *Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990) (rejecting custodial interrogation challenge when, in response to suspect's volunteered statement, "I stabbed her," police asked, "Who?"). That said, when asking a suspect about volunteered information, police may at times cross the line from asking clarifying or follow-up questions into the "express questioning or its functional equivalent," *Innis*, 446 U.S. at 300-01, barred by *Miranda*. *See, e.g.*, *United States v. Crowder*, 62 F.3d 782, 785-86 (6th Cir. 1995) (holding that police officer interrogated suspect when, after suspect stated that shotgun was "in the wood," officer asked clarifying question about location). The Supreme Court, while not explicitly clarifying the distinction between permissible follow-up questions and impermissible interrogation, has stated in a different context that, even at meetings with

the police initiated by a suspect, "[i]f, as frequently would occur . . . the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.'" *Edwards v. Arizona*, 451 U.S. 477, 486 (1981) (addressing whether police questioning of a suspect constitutes interrogation where the suspect first invoked his Fifth Amendment right to counsel but then arranged a meeting with investigators and volunteered information). Again, as the Supreme Court has made clear repeatedly, "[w]ithout obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions . . . that are designed to elicit incriminatory admissions." *Muniz*, 496 U.S. at 602 n.14. The difference between permissible follow-up questions and impermissible interrogation clearly turns on whether the police are seeking clarification of something that the suspect has just said, or whether instead the police are seeking to expand the interview. *See, e.g.*, WAYNE R. LaFAVE ET AL., 2 CRIMINAL PROCEDURE § 6.7(a), at 567 (2d ed. 1999) ("the part of defendant's statement given after the follow-up questions is volunteered only if the questions are neutral efforts to clarify what has already been said rather than apparent attempts to expand the scope of the statement previously made.").

In this case, Tolliver volunteered information about "getting the other gun out," and then entered into a discussion with Viduya regarding Tolliver's intention to invoke the right to remain silent. According to the Ohio Court of Appeals:

> The detective's comment about the gun was a follow-up to defendant's previous spontaneous statement that it was his fault for bringing out the gun. In addition, we note that in offering the voluntary statement, defendant interrupted the detective's attempt to advise defendant of his *Miranda* rights. As noted in *Miranda*, the police need not interrupt a suspect's volunteered statements to give the warnings.

*Tolliver*, 2004 WL 625683, at *16. Viduya's statement, which was interrogative in nature, *see Innis*, 446 U.S. at 300-01, was the equivalent of asking, "is there more than one gun in the apartment?" Tolliver, however, had just volunteered to Viduya that he "was getting the other gun out[.]" We find that, in determining that Viduya's statement was a follow-up question and thus did not constitute interrogation, the Ohio Court of Appeals did not unreasonably apply clearly established Federal law and did not

unreasonably apply the correct governing legal principles to the facts of this case. *See Williams*, 529 U.S. at 411-13. The Ohio Court of Appeals' holding on this issue – that Viduya's statement about additional guns did not represent a violation of Tolliver's Fifth Amendment rights – therefore did not exceed the latitude afforded a state court's decision on habeas review.

### 4.      Detective Viduya's comment about the location of the wound.

Immediately following Tolliver's response to Viduya's comment about additional guns, Viduya declared that he needed to know where on the body Schneider's wound was located:

> THE DEFENDANT: I am willing to share all this information with you because I have nothing to hide; however, I am not of sound mind. She was in the middle of a sentence when she accidently shot herself. I feel it was my fault, because she didn't know the gun was loaded. She said, "What do you want me to - -" pow. I turned around and she was falling at my feet. I have nothing - -
>
> THE OFFICER: I understand. You put me in a corner, because there are questions I need to ask you. When you are saying, she shot herself, I need to know where she shout [sic] herself (inaudible) - -
>
> THE DEFENDANT: You wouldn't even be talking me right now (inaudible) - -
>
> THE OFFICER: **I need to know where, you know, the wound is on the body.**

(JA 49 (emphasis added).) The Ohio Court of Appeals concluded that this statement was designed to elicit information from Tolliver, and thus "constituted express questioning in violation of *Miranda*." *Tolliver*, 2004 WL 625683, at \*16. We agree, and find that Tolliver's response was obtained unconstitutionally.

### 5.      Tolliver's order that police stop speaking until he saw his attorney.

Following Detective Viduya's comment about needing to know the location of Schneider's wound, Tolliver and Viduya began discussing how Tolliver could get an attorney without any money; Tolliver maintains that at this point in the interview, he

invoked his right to counsel, and that any statements following this point were obtained in violation of the Fifth Amendment.  We agree, and find that Tolliver's invocation rendered the remainder of the interview unconstitutional.

As the Supreme Court noted in *Miranda*, "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege."  384 U.S. at 469.  If at any time during an interview a suspect requests counsel, "he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."  *Davis*, 512 U.S. at 458 (citing *Edwards*, 451 U.S. at 484-85).  A suspect need not "speak with the discrimination of an Oxford don," but must be unambiguous.  *Id*. at 459.  This means that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  *Id*.  In determining whether a reasonable officer conducting the interview would have understood that Tolliver was asking for an attorney, we may consider what came before the request, but may not look to Tolliver's *subsequent* statements to determine whether the initial request was ambiguous.  *Smith v. Illinois*, 469 U.S. 91, 97-98 (1984) (holding that a suspect's "postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself").[9]

Tolliver clearly demanded that he wanted questioning to stop until he could speak to his lawyer – an invocation that was made even clearer by the context of his demand.  Tolliver and Detective Viduya were discussing attorneys, and in response to Tolliver's concerns that he did not have any money, Viduya explained that the police would provide Tolliver with an attorney:

> THE DEFENDANT:  But at this time in the morning?
>
> THE OFFICER:  We can call you an attorney.  I mean, we wake them up
> all the time.  You won't be the first person we do that for.  You know,

---

[9]In analyzing Tolliver's demand for police to stop talking until he could see his attorney, the magistrate judge both mischaracterized Tolliver's comments as an assertion of his "right to remain silent" (rather than as an assertion of his right to counsel) and then ignored the import of *Smith v. Illinois* by focusing on the fact "that immediately after making this statement, petitioner said he was willing to talk." (Magistrate Judge Order and Memorandum and Opinion at 50-51.)

you don't have to answer any questions right now, and that's fine. But it's two parts to every story. We go by what we see at the scene. Then we just have to process evidence from the scene and take it as that. But she can't tell us what happened, because she is dead. You are the only one that can tell us, and all I want to do is go over your rights, just tell you that you do have the right to remain silent, and anything you say is public in this room. You know - - you know, it can be used against you in court.

THE DEFENDANT: **All right. Wait. Stop talking right now. Find me someplace where I can be by myself, so I don't have to interact with other people right now until I can see my attorney**, and see my daughter, because beyond seeing my daughter (inaudible) - - I just lost my whole world.

THE OFFICER: So what you are saying is, you don't want to talk about this or give a statement about what happened?

(JA 51-52) (emphasis added).

In *Davis*, 512 U.S. at 454, the case establishing how law enforcement officers should respond to references to counsel that are "insufficiently clear to invoke the *Edwards* prohibition on further questioning," the suspect at one point (following waiver of his *Miranda* rights)[10] declared "maybe I should talk to a lawyer." *Id.* at 455. Having clarified the requirement that requests for counsel be unambiguous, the Supreme Court in *Davis* determined that there was no reason to "disturb [the lower courts'] conclusion" that "maybe I should talk to a lawyer" was not such an unambiguous request. *Id*. at 462. In this case, having reviewed the interview, the Ohio Court of Appeals concluded that "Defendant's remark is no more an unequivocal request for counsel than Davis', 'maybe I should talk to a lawyer.'" *Tolliver*, 2004 WL 625689 at *17. The Ohio Court of Appeals offered no other justification for its determination.

We conclude that, while the Ohio Court of Appeals identified the correct governing principle from *Edwards* and *Davis*, it unreasonably applied that principle to

---

[10]As the Supreme Court explicitly recognized, *Davis* was decided in the context of a *Miranda* waiver. *Davis*, 512 U.S. at 460-61. *Davis*, in other words, applies *because* "[a] suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted." *Id*. Here, the police never informed Tolliver of his *Miranda* rights – and so should have been even more alert to Tolliver's request.

the facts of Tolliver's case. *See Williams*, 529 U.S. at 412-13. In fact, given the context, any reasonable police officer would have immediately understood that Tolliver was asking to see an attorney. Unlike the statement in *Davis*, which was the expression of a thought, the statement in this case was a demand for police to "*stop talking*" until Tolliver could see his lawyer. Nonetheless, the police ignored Tolliver's demand, and continued to ask questions. We therefore find that Tolliver's request was an unambiguous invocation of his Fifth Amendment right to counsel, and that continued questioning following that invocation constituted a constitutional violation.

### B. Harmlessness

As we conclude that some of Tolliver's statements to police – all those following Detective Viduya's comment regarding needing to know about the location of the wound – were unconstitutionally obtained, and so improperly admitted at trial where the prosecution used them to cast doubt upon Tolliver's credibility, we must next consider whether the Ohio trial court's error in admitting these statements was harmless. For the purposes of habeas review, federal courts must assess the prejudicial impact of constitutional errors under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Fry v. Pliler*, 551 U.S. 112, 114 (2007); *Ruelas v. Wolfenbarger*, 580 F.3d 403, 412 (6th Cir. 2009). Under this standard, an error is harmless unless it had a substantial and injurious effect or influence in determining the jury's verdict. *Fry*, 551 U.S. at 116. If the court is certain that the error had no or a small effect, the error is harmless; when, in contrast, "a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

The question we are facing here closely mirrors the question the Supreme Court faced in *Brecht* itself. Todd Brecht had used a rifle belonging to his brother-in-law Roger Hartman to shoot Hartman in the back, after which Brecht fled before being apprehended. *Brecht*, 507 U.S. at 623-25. Once on trial, Brecht claimed that he had

been holding the rifle without permission when he was startled by Hartman's arrival, and that in his rush to replace the rifle, he tripped and accidentally fired. *Id.* In order to cast doubt upon Brecht's story, the prosecution repeatedly highlighted the fact that, prior to the trial, Brecht had remained silent (both before and after receiving a *Miranda* warning) and had never told anyone that the shooting was an accident. *Id.* While the state and federal courts that considered Brecht's appeal agreed that the prosecution had violated Brecht's due process rights under *Doyle v. Ohio*, 426 U.S. 610 (1976), by discussing Brecht's post-*Miranda* silence, they disagreed on whether the prosecution's error was so harmful as to necessitate relief. *Id.* at 626. After clarifying the standard federal courts should apply in habeas proceedings, the Supreme Court quickly concluded that the prosecution's error was harmless. *Id.* at 638-39. In particular, the Court pointed to the facts that the government's evidence of guilt was, "if not overwhelming, certainly weighty," and that the government's "references to [Brecht's] post-*Miranda* silence were infrequent, comprising less than two pages of the 900-page trial transcript." *Id.* at 639. More importantly, the Court concluded that "in view of the State's extensive and permissible references to [Brecht's] pre-*Miranda* silence . . . . its references to [Brecht's] post-*Miranda* silences were, in effect, cumulative." *Id.*

As in *Brecht*, "our inquiry here is whether, in light of the record as a whole, the State's improper use for impeachment purposes" of Tolliver's unconstitutionally-obtained statements "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 638. We begin by considering how the prosecution used Tolliver's unconstitutionally-obtained statements to cast doubt upon Tolliver's credibility. Following the point at which police began interrogating Tolliver and after which Tolliver's responses were obtained unconstitutionally, Tolliver for the first time made the following statements: (1) "I could feel her jaw, felt like it was broken but I couldn't find the entryway," (JA 49); (2) "I went across the hall, banged on the door, and the guy - - there was nobody home," (JA 49); (3) "We were going to the Dominican Republic for two months, starting in January," (JA 50); (4) "I wanted to see my daughter, because I wanted to kill myself," (JA 56); (5) "It would have been one second shot had I got to spend time with my daughter before you showed up," (JA 54); (6) "If

you can find any residue or gun powder on my hands - - if you don't find any on hers, then you can come and you can ask me questions beyond that you want to.  Forensics will show you that I did not pull any triggers," (JA 53-54); (7) "I put the clip in [the gun]," (JA 54); and (8) "We were naked," (JA 53).

During its closing, the prosecution discussed Tolliver's improperly-obtained statements about: gunpowder residue; his desire to kill himself after seeing his daughter; Schneider's jaw feeling as though it was broken; banging on the door of the across-the-hall neighbor; going to the Dominican Republic for two months with Schneider; putting the clip in the gun; and wanting to spend time with his daughter before police showed up.  On rebuttal, the prosecution also reiterated that Tolliver had lied when he said that Schneider was naked.  That said, however, the prosecution's references to these improperly-obtained statements comprised fewer than three pages in a 2000-page trial transcript, (*see* JA 1950-54; 1999-2000) – less frequent use than the state made of improper material in *Brecht* itself.  While the jury also saw the video of the interrogation, well under one hour of that video (viewed in the context of a three-week trial) included portions of the interview conducted in violation of Tolliver's Fifth Amendment rights.

More importantly, just as in *Brecht*, the prosecution here also made extensive references to *permissible* evidence in order to show that Tolliver had lied to police on the night of Schneider's death.  During the closing, for example, the prosecution pointed to the following statements made by Tolliver before Detective Viduya began any interrogation: (1) "She said, 'What do you want me to - -' pow," (JA 49); (2) "My girlfriend just killed herself," (JA 32); (3) "[T]he only thing that stopped me from killing myself was my daughter," (JA 32); (4) "I . . . couldn't even find a phone," (JA 35); (5) "That's why I couldn't call anybody faster, I spent 20 minutes running through the house looking for my phone. I couldn't it [*sic*]. I finally found hers," (JA 37); (6) "[W]e just bought a house together today," (JA 37); (7) "I just bought a $7500 diamond engagement ring, and we were not having any problems," (JA 37); (8) "The only gunpowder on her – she didn't know the gun was loaded.  I had already pulled the clip out," (JA 38); (9) "[inaudible] kill myself right there with her.  I just tried to see my

daughter first. I want to see my daughter," (JA 39-40); (10) "We were planning our wedding tonight," (JA 46); (11) "She is supposed to take Paxil," (JA 46); (12) "She didn't even finish her sentence," (JA 46); (13) "I am not of sound mind," (JA 47); and (14) "But she is the only one with gun powder on her, okay," (JA 46). At the beginning of the rebuttal, the prosecution focused on Tolliver's (admissible) statement about what Schneider was supposedly saying when she was shot. In fact, the prosecutor instructed the jury that "one simple way for you to know whether Kevin Tolliver lied" was to say, along with her, "What do you want me to –," and to see whether in fact it was possible for a bullet to enter the mouth while saying those words. (JA 1999-2000.) The prosecution's discussion of the statements regarding the phone, the ring, and the wedding clearly demonstrated to the jury that Tolliver was, at the very least, not being completely truthful; the prosecutor's illustration of how difficult it would have been for a bullet to enter Schneider's mouth if she was saying "what do you want me to" when shot clearly suggested that there was something wrong with Tolliver's story. In other words, in view of the prosecution's extensive use of properly-admitted statements to demonstrate that Tolliver was lying to police during the interview, the prosecution's references to Tolliver's *improperly*-admitted statements "were, in effect, cumulative." *See Brecht*, 507 U.S. at 639.

Ultimately, despite the fact that this was a heavily circumstantial case, the prosecution's evidence of guilt – again as in *Brecht* – "was, if not overwhelming, certainly weighty." *Id.* The Ohio Court of Appeals reached this exact conclusion when – without factoring in Tolliver's interview – it found that the conviction was not against the manifest weight of the evidence. *Tolliver* 2004 WL 625683, at *18. The Ohio Court of Appeals carefully summarized and analyzed the prosecution's case, beginning with a discussion of Adams' testimony that Tolliver confessed to killing Schneider:

> Adams included details about the crime, about Claire, and about [Tolliver] that suggested [Tolliver] discussed the crime with Adams. Further, there was no evidence that Adams obtained the information to which he testified from a source other than [Tolliver]. With regard to Dye's testimony that Adams approached him and asked him to testify against [Tolliver], Dye admitted that Adams never actually asked Dye to

lie about [Tolliver]. Dye stated only that the "impression" that Adams wanted him to do so, but never explained what gave him that "impression."

Further, other evidence supports defendant's conviction. . . . forensic evidence established that Claire was shot in the mouth at close range with a 9mm weapon and that it was unlikely that Claire either committed suicide or shot herself accidentally. From the location of a fresh bruise on Claire's neck and the bullet hole in the bathroom door, the jury could have concluded that Claire had been forcibly held against the door as she was shot. [Tolliver] repositioned Claire's body after she had been shot, as shown by the numerous transfer bloodstain patterns on her body, including several digit patterns, and the fact that the pen used to write the note was found underneath Claire's body. [Tolliver] also washed his hands before the police arrived. . . .

In addition, contrary to [Tolliver's] claim that he was unable to call police immediately because he could not find a telephone, evidence established that Claire's cell phone was in the apartment and [Tolliver] had two cell phones in his vehicle. Even after locating a cell phone, [Tolliver] did not call the police. Rather, he made several calls to his ex-wife and tried to reach a friend. [Tolliver] did not call the police even after urged to do so by his ex-wife. From this evidence, the jury was entitled to conclude that [Tolliver] did not want to report the matter to the police until he was confident Claire was dead.

Finally, the jury had ample reason to doubt [Tolliver's] claim to be a distraught, grieving boyfriend. When Kovarik encountered [Tolliver] in the hallway approximately one-half hour after Claire was shot, [Tolliver] bore no indications that anything was wrong, nor did he ask Kovarik for assistance in calling the police or in aiding Claire.

*Id.* at *18-*19. In addition, Abby Warner testified that she had seen Tolliver looking angrily at Schneider at the Krome dance club, and Collin Bumgarner testified that he heard Tolliver and Schneider arguing on the night of Schneider's death. Janet Parady, who lived directly above Tolliver and Schneider, testified that for half an hour before Schneider was killed she heard the sounds of fighting – though she thought (and told the police) that the sounds came from above her head, rather than below. More tellingly, as the Ohio Court of Appeals concluded, Keith Norton and Mark Hardy together testified that the forensic evidence suggested that the gun that shot Scheider was being held

against her lips, just outside of her mouth, and that this evidence, together with the blood spatter analysis, suggested that Schneider's death was not a suicide.

Moreover, we note the highly incriminating nature of Tolliver's cellphone usage shortly after the shooting. Tolliver's defense at trial was that he performed CPR on Schneider and then "[c]ould not find the phone," as his note at the scene put it. Tolliver eventually found a phone, but did not call 911 while Schneider – his "whole world," as Tolliver repeatedly stated in the interview – bled to death in the bathroom. Instead he called his ex-wife seven times, a friend of his one time, Schneider's voicemail, and his own voicemail. Indeed Tolliver *never* called 911 after Schneider's shooting; only his ex-wife did, after Tolliver met her while covered with Schneider's blood. The admissibility of these facts is uncontested here; and they seem virtually impossible to reconcile with the proposition that Kevin had tried to save Schneider's life, rather than take it.

To summarize: If all of the statements the prosecution used at trial to argue that Tolliver had lied when speaking to the police had been improperly admitted, this would be a closer case. In fact, however, many of the statements were *properly* admitted. The prosecution's infrequent references to Tolliver's improperly-admitted statements thus "were, in effect, cumulative." *See Brecht*, 507 U.S. at 639. Given too the weighty evidence also pointing to Tolliver's guilt, we therefore find that the trial court's error in admitting Tolliver's unconstitutionally-obtained statements was harmless.

**III.**

The second question in this appeal is whether Tolliver established cause and prejudice for procedural default of his ineffective assistance of appellate counsel claim.[11] Following the Ohio Court of Appeals' (and Ohio Supreme Court's) affirmation

---

[11] A habeas petitioner procedurally defaults a claim if: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). In addition to arguing about cause and prejudice, Tolliver also maintains that Rule 26(B) is not adequate. The district court certified for appeal only the cause and prejudice question; while both parties also briefed adequacy, that question is not before us, and is therefore not subject to appellate review. *See* 28 U.S.C. § 2253(c). As it is possible to read the magistrate judge's memorandum as analyzing Tolliver's argument

of his conviction, Tolliver filed an application to reopen his direct appeal in order to argue that his appellate counsel had been ineffective for failing to contest the admission of Adam's testimony and Tolliver's non-attendance at a hearing on the admissibility of Schneider's diary. Under the Ohio Rules of Appellate Procedure, any application to reopen an appeal based on a claim of ineffective assistance of appellate counsel must be filed "within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time." Ohio App. R. 26(B). Tolliver filed his Rule 26(B) application on December 28, 2004 – more than nine months after the Ohio Court of Appeals affirmed his conviction on March 30, 2004. Tolliver bears the burden of demonstrating both "that there was 'cause' for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Scuba*, 527 F.3d at 488 (citing *Maupin*, 785 F.2d at 138). As Tolliver has failed to demonstrate that he had cause not to follow Rule 26(B), we affirm the finding that Tolliver procedurally defaulted his ineffective assistance claim.

We review de novo a district court's application of the "cause and prejudice" rules. *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 387 (6th Cir. 2004). To establish

---

about adequacy as *part of* Tolliver's argument regarding cause and prejudice, however, we make the following observations:

> To be adequate, a state procedural rule must be "'firmly established and regularly followed' by the time as of which it is to be applied." *Ford v. Georgia*, 498 U.S. 411, 424 (1991); *Parker v. Bagley*, 543 F.3d 859, 861 (6th Cir. 2008) (citing *Fautenberry v. Mitchell*, 515 F.3d 614, 640 (6th Cir. 2008)). We have repeatedly concluded that Rule 26(B) was both "firmly established" and "regularly followed" as applied in non-capital cases between 1998 and "at least" July 2002. *See, e.g.*, *Parker*, 543 F.3d at 862; *Scuba v. Brigano*, 527 F.3d 479, 488 (6th Cir. 2007); *Rideau v. Russell*, 2009 WL 2586439, at *4 (6th Cir. Aug. 24, 2009). The Ohio Court of Appeals denied Tolliver's motion on procedural default grounds on May 6, 2005. The question, then, is whether between 2002 and 2005 Ohio courts applied Rule 26(B) so inconsistently in non-capital cases such that the rule was not "firmly established and regularly followed." *Ford*, 498 U.S. at 424.
>
> Tolliver points to a total of six non-capital cases in which, he argues, the Ohio courts have applied Rule 26(B) inconsistently. In four of these cases, however, the courts *did* apply Rule 26(B), but for various reasons found that the petitioners had shown good cause for their untimely filings. *State v. Hicks*, 2005 WL 1389079, at *1 (Ohio Ct. App. June 10, 2005); *State v. Embry*, 2005 WL 280213, at *1 (Ohio Ct. App. Feb. 1, 2005); *State v. Huggins*, 2004 WL 2634625, at *1 (Ohio Ct. App. Nov. 15, 2004); *State v. Rhodes*, 2004 WL 1925968, at *1 (Ohio Ct. App. Aug. 25, 2004). In one of the remaining cases, the court concluded that the application was *not* late, as the application was filed within ninety days of the court's second appellate opinion, following resentencing. *State v. Hutchins*, 2005 WL 315246, at *1 (Ohio Ct. App. Feb. 8, 2005). Tolliver thus identifies only a single 2005 case in which a court arguably ignored Rule 26(B). *See State v. Jordan*, 2005 WL 3047527, at *1-*2 (Ohio Ct. App. Nov. 9, 2005). A petitioner "must show more than '[a]n occasional act of grace by a state court in excusing or disregarding a state procedural rule' in order for a federal court to conclude that the state procedural rule is inadequate because inconsistently applied." *Hutchison v. Bell*, 303 F.3d 720, 737 (6th Cir. 2002) (citing *Coleman v. Mitchell*, 268 F.3d 417, 429 (6th Cir. 2001)). Tolliver here has failed to show more than that "occasional act of grace."

cause, Tolliver must present "a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007). Tolliver argues that he had cause, because: (1) he interpreted the time limitation, in good faith, to run from the judgment of the Ohio Supreme Court, rather than from the judgment of the Ohio Court of Appeals; (2) he received ineffective advice from counsel regarding the time limit for filing under 26(B); and (3) filing the claim would have damaged his ongoing relationship with counsel. None of these arguments is sufficient to demonstrate cause within the meaning of *Maupin*, 785 F.2d at 138, and *Hartman*, 492 F.3d at 358.

Tolliver's first argument is that he had cause for his procedural default because he made a good faith interpretation of Rule 26(B)'s time period. Conceding that the language of the rule requires an application to be filed within ninety days from journalization of the "appellate judgment," Tolliver argues that "appellate judgment" might easily refer to the Ohio Supreme Court's dismissal of the case rather than the opinion of the Ohio Court of Appeals. This is an unconvincing argument. Given that the Rules of Appellate Procedure govern the Ohio Courts of Appeals, and clearly distinguish between the Courts of Appeals and the Ohio Supreme Court, *see* Ohio R. App. P. 41, it is readily apparent that any reference to the "appellate judgment" in the rules refers to the judgment of the Court of Appeals. Tolliver points to two cases in which, he argues, courts seemed to measure the ninety day period from the final decision of the Ohio Supreme Court. *See Griffin v. Andrews*, 2006 WL 1526114 (S.D. Ohio May 24, 2006); *State v. Evans*, 2005 WL 2789455, at *2 (Ohio Ct. App. Oct. 24, 2005). In *Evans*, however, the court clearly applied Rule 26(B) to the period running from journalization of the opinion of the appeals court. *See Evans*, 2005 WL 2789455, at *1. (The *Evans* court discussed the Ohio Supreme Court decision merely to explain why, even if it accepted the defendant's argument that the court should run the ninety-day period from the Ohio Supreme Court opinion, the defendant would nonetheless lose.) Even if Tolliver is correct that the judge in *Griffin* incorrectly focused on the seven-year period between the final decision of the Ohio Supreme Court and the petitioner's application, a single ambiguous recommendation or observation by a federal magistrate

judge – especially where Tolliver does not claim that he even *knew* about the *Griffin* case – cannot be sufficient to establish a good faith belief that the Ohio Rules of Appellate Procedure do not mean exactly what they say.  Regardless, even a good faith belief is nonetheless an internal factor (rather than a "substantial reason" that cannot be fairly attributed to Tolliver) that is therefore insufficient to establish cause for procedural default.  *Hartman*, 492 F.3d at 358.

Tolliver next argues that he had cause for his procedural default because as he received ineffective advice from his counsel, who (he claims) failed to warn him about the ninety-day deadline or even to tell him in time about the possibility of filing a 26(B) motion.  Under Ohio law, however, a Rule 26(B) proceeding is a "separate collateral" proceeding rather than part of the original appeal.  *See Morgan v. Eads*, 818 N.E.2d 1157, 1158 (Ohio 2004); *Scuba*, 527 F.3d at 485.  Tolliver therefore has no constitutional right to counsel for the proceeding – and thus certainly had no constitutional right to *effective* counsel.  *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further.").  By statute, moreover, "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief" in a habeas proceeding.  28 U.S.C. § 2254(i).  As Tolliver was not entitled to representation for his Rule 26(B) application, any poor advice he received from an attorney cannot establish cause for his default.

Finally, Tolliver argues that he had cause because filing the claim would have damaged his ongoing relationship with his counsel, who was still representing him in his appeal to the Ohio Supreme Court during the ninety days following journalization of the decision on direct appeal of the Ohio Court of Appeals.  For this proposition, Tolliver points to the Sixth Circuit decision in *Fautenberry v. Mitchell*, in which the panel in dicta observed that at one point in time the petitioner had "good cause" for a delay in filing a 26(B) motion, as he was still represented by his appellate attorney and as it would have been "unreasonable to expect counsel to raise an ineffective assistance claim

against himself." *Fautenberry*, 515 F.3d at 640.**12** Saying that it is unreasonable to expect an attorney to raise an ineffective assistance claim against himself, however, is not the same as saying that a petitioner has cause to ignore the requirements of Ohio Rule 26(B) because the petitioner is still being represented by the same counsel of whose assistance he wishes to complain. As the Ohio Supreme Court – itself addressing "good cause" within the language of 26(B) – observed of a similar argument, "[o]ther attorneys – or [petitioner] himself – could have pursued the application." *State v. Gumm*, 814 N.E.2d 861, 863 (Ohio 2004). Regardless of whether on direct appeal he was still represented by the attorney about whose behavior he wished to complain in collateral proceedings, Tolliver certainly could have filed – and, in fact, ultimately *did* file – his application *pro se*, or could have retained a different attorney. In that case, his attorney would not have been put in the position of filing a 26(B) application against himself. More tellingly, Tolliver's own evidence suggests that his relationship with his attorney was secure. On October 5, 2004, Carol Wright, the attorney about whose assistance he is now complaining, wrote Tolliver, "again highly recommend[ing]" that he file a 26(B) motion and asking to be kept informed. (JA 2865.)

Accordingly, we disagree with the *Fautenberry* dicta, and conclude that a petitioner does not have cause for procedural default in filing a collateral motion or application concerning ineffective assistance of counsel because he continues to be represented on direct appeal by the counsel of whose assistance he wishes to complain. *Cf. Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir. 1998) (observing that the Ninth Circuit has repeatedly rejected the argument that a petitioner's procedural default on collateral appeal of an ineffective assistance on appeal claim should be excused for cause when the petitioner was represented by the same attorney during both direct and collateral appeal, as the attorney is prevented from raising his own ineffectiveness due to a clear conflict of interest); *Bonin v. Calderon*, 77 F.3d 1155, 1159 (9th Cir. 1996) (holding that a claim of ineffective assistance of counsel on direct appeal was defaulted for not being raised

---

**12**In addition to speaking in dicta, the *Fautenberry* court was not clear about whether it was addressing the "cause" a petitioner must show to satisfy the *Maupin* factors or about the "good cause" described by the language of Ohio R. App. P. 26(B) itself. In this case, we are discussing only cause within the meaning of *Maupin*, 785 F.2d at 138.

in the petitioner's first federal habeas proceeding, even though the same counsel represented the petitioner in both proceedings). Accordingly, we find no error in the district court's ruling that Tolliver failed to show cause excusing procedural default.[13]

## IV.

While some of the statements used by prosecutors to cast doubt upon Tolliver's credibility were obtained in violation of Tolliver's Fifth Amendment rights, and were consequently improperly admitted at trial, the prosecution's references to these statements were cumulative, and so the trial court's error was harmless. Tolliver, moreover, has not established cause for his procedural default. Accordingly, we **AFFIRM** the district court's denial of Tolliver's habeas petition.

---

[13]It is doubtful that Tolliver could demonstrate prejudice, as in order to do so, he would need to demonstrate that he would prevail on the merits of his ineffective assistance claim. *See, e.g.*, *Moore v. Carlton*, 74 F.3d 689, 692 (6th Cir. 1996) (observing that the final step of considering a prejudice claim involves examining the merits of that claim) (citing *Maupin*, 785 F.2d at 139-40). Tolliver argues that his appellate counsel failed to argue that: (1) the government improperly interrogated Tolliver through Adams in violation of *Massiah v. United States*, 377 U.S. 201, 206 (1964); and (2) Tolliver was entitled to attend a pre-trial hearing on the admissibility of the diary. Tolliver's merits arguments are weak: his first depends upon a single ambiguous statement uttered by Adams during cross-examination, and his second is not sufficient to overcome the presumption of effective assistance given that Tolliver's appellate counsel *did* argue that the diary should be admitted. *See Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.") (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Regardless, as we find that Tolliver cannot establish cause, we need not reach the prejudice question at all.