[Cite as *State v. Brown*, 2019-Ohio-2187.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2018CA00107 |
| AULETTI DALANE BROWN, JR. | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING:      Criminal appeal from the Stark County Court of Common Pleas, Case No.2017CR2362

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      June 3, 2019

APPEARANCES:

For Plaintiff-Appellee

JOHN D. FERRERO
StarkCounty Prosecutor
BY: MICHAEL BICKIS
110 Central Plaza South
Suite 510
Canton, OH  44702

For Defendant-Appellant

GEORGE URBAN
116 Cleveland Avenue NW, Ste. 808
Canton, OH 44702

*Gwin, P. J.*

{¶1}    Appellant Auletti Dalane Brown, Jr. ["Brown"] appeals his conviction and sentence after a jury trial in the Stark County Court of Common Pleas.

*Facts and Procedural History*

{¶2}    Y.W.'s and his fiancée M.L. lived on Ingram Avenue, SW, Canton, Stark County, Ohio, with her four children, including a three-year-old son that she had with Y.W.  M.L. is Brown's cousin.

{¶3}    On December 10, 2017, around seven o'clock in the evening, Y.W. and M. L. were at home with their children, drinking alcohol and smoking marijuana.  Y.W. left and walked to Maggiore's Drive-thru to purchase alcohol. At approximately the same time, Brown left his home on Maryland Avenue, SW to go to Maggiore's Drive-thru to purchase beer and cigarettes.  Brown testified that when he left home, he put his knife in his pants pocket because he always carried a knife with him when he left his house.

{¶4}    Brown and Y.W. got into a verbal and physical altercation outside the Maggiore's drive thru on Dueber and 9th Street in Canton, Ohio.  Y.W. pushed Brown to the ground and accused Brown of slashing his car tires.  Brown called 9-1-1, told the dispatcher never mind and hung up.  Both left the area and walked to their respective homes, which were within blocks of each other.  Surveillance cameras in the area captured portions of this altercation.

{¶5}    M. L. testified that Brown had been told to stay away from their home "because his drinking leads to violence."  1T. at 187[1].  M.L. testified when Y.W. returned

---

[1] For clarity sake, the transcript of the jury trial will be referred to by volume and page number as "T."

from the drive thru he was angry. Y.W. told her that he had pushed Brown down and that if Brown was not her cousin he would have really punched on him. 1T.at 194. M.L. testified that she never heard a knock on the door that day, but heard Brown outside hollering and screaming, "Mother fucker." 1T.at 208; 3T. at 535. M.L. testified that she saw Y.W. head for the door and she told him not to go, but Y.W. said, "I'm tired of him." M.L. testified that Brown came up the steps with his hands in his pockets. Y.W. took a swing at Brown and missed. She then saw Y.W. fall to the ground. M.L. testified that when Y.W. walked back up the steps, he was bleeding like a faucet and said, "He stabbed me Bae" and fell. 1T. at 197. Then she heard Brown say "Yeah, Nigga" and then Brown calmly walked away.

{¶6} On his way home, Brown hid the knife in the bushes by his neighbor's house. Officers responding to Brown's 9-1-1 call, saw Brown, and observed that he fit the physical description of Y.W.'s assailant. The officers tried to talk with Brown, but Brown put his head down and ran. The officers eventually cornered Brown and took him into custody. The arresting officers took photos of Brown's neck and abdomen and did not observe any physical injuries to his neck. When Brown was initially questioned by the police he claimed he did not know Y.W. but later admitted he went to the house to speak with "Yoshie" and that he stabbed Y.W. claiming it was in self-defense. 3T. at 627. He also told the detectives, "No one gets over on Auletti Brown." At trial Brown testified that he was being strangled when he stabbed Y.W.

{¶7} Dr. Renee Robinson, a forensic pathologist at the Stark County Coroner's Office, performed the autopsy on Y.W. Dr. Robinson testified that she observed defensive wounds on Y.W.'s forearms. She stated that it would have been difficult for a person to

sustain the injuries unless they were in a defensive position. She testified that the puncture wound to Y.W.'s' heart was the result of a sharp force to Y.W.'s arm and chest in a single action and consistent with the knife in evidence. 3T. at 471-476. She testified that the puncture to Y.W.'s heart resulted in excessive bleeding and that he lost approximately 2 liters of blood as the result. Dr. Robinson testified that Y.W. died because of a sharp force injury to the chest.

{¶8} At trial, Brown represented himself, called witnesses and testified on his own behalf. Throughout the proceedings, Brown maintained that he acted in self-defense. After the presentation of evidence, Brown requested and was granted a jury instruction on self-defense.

{¶9} The jury found Brown guilty of murder and felonious assault. The court found Brown guilty of the Repeat Violent Offender Specification. The state agreed that the felonious assault conviction merged into the murder conviction and elected for sentencing on the murder charge.

{¶10} The court imposed a 15 year to life sentence of the murder conviction and a 10-year sentence for the repeat violent offender to run consecutively for an aggregate sentence of 25 years to life in prison.

*Assignments of Error*

{¶11} Brown, through counsel, raises two Assignments of Error,

{¶12} "I. THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION TO SUPPRESS.

{¶13} "II. APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

I.

**{¶14}** In his First Assignment of Error, Brown contends that the trial court erred by overruling his motion to suppress Brown's statement to the police. Subsumed within this generalized objection are three challenges to the trial court ruling. Specifically, Brown contends that: (1). Officers continued to question him after he asked for an attorney; (2) the Officers failed to re-advise Brown of his *Miranda* rights after a three minute break in questioning and (3) Brown did not voluntarily waive his *Miranda* rights.

**STANDARD OF APPELLATE REVIEW**

**{¶15}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 154-155, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate witness credibility. See *State v. Dunlap*, 73 Ohio St.3d 308,314, 1995-Ohio-243, 652 N.E.2d 988; *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). Accordingly, a reviewing court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings. See *Burnside,* supra; *Dunlap,* supra; *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1(4th Dist.1998); *State v. Medcalf*, 111 Ohio App.3d 142, 675 N.E.2d 1268 (4th Dist.1996). However, once this Court has accepted those facts as true, it must independently determine as a matter of law whether the trial court met the applicable legal standard. See *Burnside,* supra, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539(4th Dist. 1997); See, generally, *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740(2002); *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911(1996). That is, the application of the law to the trial

court's findings of fact is subject to a *de novo* standard of review *Ornelas*, supra. Moreover, due weight should be given "to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas*, supra at 698, 116 S.Ct. at 1663.

**ISSUES FOR APPEAL.**

**A. Whether Brown invoked his right to counsel during custodial interrogation by Detective George.**

{¶16} Brown first contends that all the statements he made to the Canton police detectives while in custody on December 10, 2017 should have been suppressed, because his Fifth Amendment right to counsel during custodial interrogation, *see Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was violated when Canton police interrogated him after he had invoked his right to counsel. A video of Brown's interview with the detectives was played during the hearing on Brown's Motion to Suppress and during his jury trial. State's Exhibit 1.[2]

{¶17} If a suspect in custody requests counsel, "interrogation must cease until an attorney is present." Id. Moreover,

When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. * * * [A]n accused, * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel

[2] For clarity, the transcript of the Apr. 19, 2018 hearing on Brown's Motion to Suppress will be referred to as "S.H."

has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards v. Arizona*, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)(Footnote omitted.); *State v. Trench,* Oh. Sup. No. 2016-0899, 2018-Ohio-5205 (Dec. 26, 2018), ¶25.

{¶18} However, "the suspect must *unambiguously* request counsel." (Emphasis added.) *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id. at 461-462, 114 S.Ct. 2350. The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. at 459, 114 S.Ct. 2350, 129 L.Ed.2d 362. Moreover, if the suspect does request counsel, police may still interrogate him if—but only if—he initiates a conversation. *Edwards* at 485, 101 S.Ct. 1880, 68 L.Ed.2d 378; *Trench,* ¶756.

**1. December 10, 2017 Brown is taken into custody.**

{¶19} Detective George testified that he knew that Brown had a lengthy criminal history and, that Brown was familiar with the criminal justice system. Detectives George and Walker placed Brown in an interview room with video and audio recording capabilities.

{¶20} Brown was secured and patted down for weapons and remained in his street clothing. Prior to the interview, Brown's handcuffs were removed, and, he was offered something to drink. SH. at 14-15.

{¶21} Brown asked Detective George what charges had been filed against him. Brown further let the officers know that he was familiar with the system and his constitutional rights stating, "I'm not the average stupid fucker-keep it gangster, keep it real"; "I got a lawyer, trust me, it ain't even like that."

{¶22} Detective Walker gave Brown a *Miranda* warning. S.H. at 23. Brown was then asked if he understood what had been read to him, to which he responded, "yes sir." He was asked if he had any questions about the *Miranda* warning to which he responded "no." He was then asked to read aloud a section of the warning prior to questioning. Brown read the following statement, "I have had the above Constitutional Rights read to me and I fully understand them and I do hereby waive my rights." Brown said, "I know what it means" and signed a written waiver of rights form. State's Exhibit 2. Brown acknowledges that he was read his *Miranda* right, understood his rights and signed a written waiver of *Miranda* rights form. [Appellant's Brief at 7-8].

## 2. Brown Contends That He Invokes His Right to Counsel

{¶23} At 10:19:45 in the video, the following exchange took place between Det. George and Brown:

**Brown:** What happens if do this- what happens if I say-

Well-Get me a lawyer?

**Sgt. George:** You want lawyer?

**Brown:** I can call my lawyer right now.

**Sgt. George:** Do you want a lawyer-

**Brown:** Yeah

**Sgt. George:** or do you want to talk with us?

**Brown:** It just seems like you want to talk to me, but you don't want me to talk to you.

**Sgt. George:** I don't understand that.

**Brown:** You want me to talk to you– no- you want to talk to me, but you don't want me to talk to you.

**Sgt. George:** Well, I am asking you questions and I want answers.

**Brown:** Yeah, I want answers too. So, we just sitttin' here-

**Sgt. George:** You want an answer of what I'm going to charge you with, but I don't know yet until I talk to you. Let's put it this way-Ok

**Brown:** All I am asking is this one question- all I am asking is this one question and I'll tell you everything that happened

**Sgt. George:** Do you want to know what I am going to-

**Brown:** Listen-

**Sgt. George:** charge you with-yes or no?

**Brown:** Yeah.

**Sgt. George:** Ok, if you don't say another word to me and tell me "I'm not going to talk to you," I'm going to charge you with murder tonight because [Y.W.] is dead.

Now, if you want to tell me your side of what happened, that could change, but as of right now, [Y.W.] is dead, he was

stabbed, he is not coming back to life- and that's what I am going to charge you with if you don't want to say another word.

If you want to talk to me and tell me your side of what happened, it could change

**Brown**: It still don't-

**Sgt. George:** I wasn't there

**Brown:** It still don't mean the same thing- but I'm still going to say it-

**Sgt. George:** Ok.

**Brown:** My love go out to everybody, my family, but he didn't make it- So, I'm going to say it like this-this is what happened

**Brown:** (inaudible) make it.

**Sgt. George:** No

**Brown:** I need a couple seconds.

**Sgt. George:** Would you like a glass of water?

**Brown:** (inaudible) no. Give me a couple of seconds and I'll tell you everything.

**Sgt. George:** Ok.

**{¶24}** Brown argues that when the detective said, "Do you want a lawyer or do you want to talk with us? Brown responded, "Yeah," he made an "unequivocal request for an attorney" and that thereafter, the police should have stopped all questioning. The trial court found that Brown did not "unequivocally and unambiguously" ask for an attorney.

**{¶25}** "In determining whether a reasonable officer conducting the interview would have understood that [the suspect] was asking for an attorney, we may consider what came before the request, but may not look to [the suspect's] subsequent statements to determine whether the initial request was ambiguous." (Emphasis deleted.) *Tolliver v. Sheets,* 594 F.3d 900, 922 (6th Cir.2010), *citing Smith v. Illinois,* 469 U.S. 91, 97-98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). But, even then, a suspect's alleged invocation must be examined "'not in isolation but in context.' " *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 37, *quoting State v. Murphy*, 91 Ohio St.3d 516, 520-521, 747 N.E.2d 765 (2001).

**{¶26}** "If a suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis* [*v. United States,* 512 U.S. 452] at 461-62. *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 18. The officers also have no obligation to ask clarifying questions to ascertain if the suspect is attempting to invoke his right to counsel. *Davis* at 461-462. Relying on *Davis*, the Supreme Court of Ohio held,

> If the suspect says something that may or may not be an invocation of the right, police may continue to question him; they need not treat the ambiguous statement as an invocation *or try to clear up the ambiguity*. *See Ross*, 203 Wis.2d at 75–76, 552 N.W.2d at 432, and fn. 4 (citing cases); *State v. Owen* (Fla.1997), 696 So.2d 715, 717–718; *State v. King* (Me.1998), 708 A.2d 1014, 1017.

*State v. Murphy,* 91 Ohio St.3d 516, 521, 2001-Ohio-112, 747 N.E.2d 765 (emphasis added).

{¶27}  In the case at bar, the ambiguity arises because both Detective George and Brown were speaking at the same time.  Detective George testified that he was in the middle of finishing his sentence when Brown responded, "Yeah."  S.H. at 43.  Brown asked for and was given a break.  The detectives left the interview room for almost three minutes.  S.H. at 33.  When the detectives returned, Sgt. George asked Brown to tell him what happened.  Brown thereafter admitted to stabbing Y.W. explaining that he had acted in self-defense.

{¶28}  When reviewing the video evidence of Brown's statements concerning counsel we do not find that he clearly or unambiguously invoked his right to counsel.  At best, a reasonable officer in Sgt. George's position would have thought that Brown might be asking to speak with counsel, or might be saying that he would speak with the detectives.  This does not satisfy the clear and unambiguous standard set forth in *Davis*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362.  Because Brown's statement was not a clear, unambiguous request for legal counsel, the trial court did not error in overruling Brown's motion to suppress on that basis.

**B.  Whether the officers were required to re-advise Brown of his *Miranda* rights after a three-minute break in questioning.**

{¶29}  Brown next argues that he invoked his right to counsel.  After the officers took a short break from questioning, they resumed questioning without re-advising Mr. Brown of his *Miranda* rights.

{¶30}  After learning that Y.W. had died, Brown began to sob.  Brown then stated, "I'm gonna say it like this.  This is what happened."  Brown began sobbing and told the detective, "I need a couple seconds and then I'll tell you everything."  The detectives left

the interview room for almost three minutes. S.H. at 33. When the detectives returned, Sgt. George asked Brown to tell him what happened. Brown thereafter admitted to stabbing Y.W. after retrieving a knife from Brown's home. Brown explained that he had acted in self-defense.

{¶31} In *Berghuis v. Thompkins*, 560 U.S. 370, 386, 130 S.Ct. 2250, 176 L.Ed. 2d 1098 (2010), the U.S. Supreme Court found no *Miranda* violation where the suspect made a statement nearly three hours after receiving his *Miranda* warning:

> If Thompkins wanted to remain silent, he could have said nothing in response to Helgert's questions, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation. The fact that Thompkins made a statement about three hours after receiving a *Miranda* warning does not overcome the fact that he engaged in a course of conduct indicating waiver. Police are not required to re-warn suspects from time to time. Thompkins' answer to Helgert's question about praying to God for forgiveness for shooting the victim was sufficient to show a course of conduct indicating waiver.

{¶32} In *State v. Roberts*, 32 Ohio St.3d 225, 513 N.E.2d 720 (1987), the Ohio Supreme Court applied a totality of the circumstances test and found that the warnings given earlier had gone stale at the time the defendant made incriminating statements:

> The totality of the circumstances test is explained by the Supreme Court of North Carolina in *State v. McZorn* (1975), 288 N.C. 417, 219 S.E.2d 201. The following criteria are set forth:

" * * * (1)[T]he length of time between the giving of the first warnings and subsequent interrogation, * * * (2) whether the warnings and the subsequent interrogation were given in the same or different places, * * * (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers, * * * (4) the extent to which the subsequent statement differed from any previous statements; * * * [and] (5) the apparent intellectual and emotional state of the suspect. * * *" (Citations omitted.) *Id.* at 434, 219 S.E.2d at 212. See, also, *State v. Myers* (Me.1975), 345 A.2d 500; *State v. Artis* (1981), 304 N.C. 378, 283 S.E.2d 522.

**{¶33}** We have found that Brown did not clearly and unequivocally request an attorney. Therefore, the police were not required to refrain from continuing the interrogation after the three-minute break unless Brown initiated the request. In any event, Brown's conduct and his statements would clearly lead a reasonable police officer to believe that Brown was indicting his willingness to resume the interrogation once he had a moment to reflect upon the events that had transpired. Brown could have said nothing when the detectives returned, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation. The trial court did not err in overruling Brown's motion to suppress on that basis.

### C. Whether Brown voluntarily waived his *Miranda* rights.

**{¶34}** The question of an effective waiver of a Federal Constitutional right in a State criminal proceeding is governed by Federal standards. *Boykin v. Alabama*, 395, U.S. 238(1969). (*Citing Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934(1965). For a waiver to be valid under the Due Process clause of the United States

Constitution, it must be: "[a]n intentional relinquishment or abandonment of a known right or privilege." *Boykin, supra,* 395 U.S. at 243 n. 5 (*Quoting Johnson v. Zerbst* (1938), 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461).

{¶35} Coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. See *Moran v. Burbine,* 475 U.S., at 421, 106 S.Ct., at 1141 ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.... [T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements"); *Fare v. Michael C.,* 442 U.S. 707, 726-727, 99 S.Ct. 2560, 2572-2573, 61 L.Ed.2d 197 (1979) (The defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit.... The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*"). *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473(1986).

{¶36} In *Colorado v. Connelly,* the United States Supreme Court held that "police over-reaching" is a prerequisite to a finding of involuntariness. Evidence of use by the interrogators of an inherently coercive tactic (*e.g.,* physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger the totality of the circumstances analysis. *State v. Clark,* 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854. (1988). In *State v. Belton,* the Ohio Supreme Court further defined "coercion,"

> This court may find coercion when law-enforcement officers "persuad[e] or deceiv[e] the accused, with false promises or information,

into relinquishing his rights and responding to questions." *Edwards*, 49 Ohio St.2d at 39, 358 N.E.2d 1051. However, "the presence of promises does not as a matter of law, render a confession involuntary." Id. at 41, 358 N.E.2d 1051. Officers may discuss the advantages of telling the truth, advise suspects that cooperation will be considered, or even suggest that a court may be lenient with a truthful defendant. Id. And "[a]dmonitions to tell the truth are considered to be neither threats nor promises." *State v. Loza*, 71 Ohio St.3d 61, 67, 641 N.E.2d 1082 (1994); *see also State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 29. Finally, it is not unduly coercive for a law-enforcement officer to mention potential punishments. *See State v. Western*, 2015-Ohio-627, 29 N.E.3d 245, ¶ 38 (2d Dist.); *compare State v. Robinson*, 9th Dist. Summit No. 16766, 1995 WL 9424, *4 ("While a correct statement of the law may not render a confession involuntary, a misstatement of the law may cause such a confession to be involuntary").

149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶111.

**{¶37}** In the cause *sub judice,* Brown does not assert that he was physically deprived or mistreated while at the police department, nor does the record reveal any type of physical deprivation. Moreover, there is no evidence that police subjected Brown to threats or physical abuse, or deprived him of food, sleep, or medical treatment. See *State v. Cooey*, 46 Ohio St.3d 20, 28, 544 N.E.2d 895, 908(1989).

**{¶38}** In Ohio, in order to determine whether an individual has waived his or her rights to remain silent and have the assistance of counsel, we must examine the totality

of the circumstances surrounding the waiver. *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854(1988). This approach requires us to inquire into all the circumstances surrounding the interrogation. This includes the age, mentality and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051(1976), paragraph two of the syllabus, *reversed on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155(1978).

{¶39} Evidence of a written waiver form signed by the accused is strong proof that the waiver was valid. *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854(1988)*;* see *North Carolina v. Butler*, 441 U.S. 369, 374-375, 99 S.Ct. 1755, 1758-1759, 60 L.Ed.2d 286, 293(1979); *State v. Dennis*, 79 Ohio St.3d 421, 425, 1997-Ohio-372, 683 N.E.2d 1096, 1102(1997). Further, Brown acknowledged at the beginning of the tape-recorded interview with Detective George that he had previously read his rights and that he understood them.

{¶40} As an initial matter, other than the fact that Brown was in police custody, nothing about the circumstances of his interrogation was inherently coercive. Brown is 40 years old and has extensive experience with the criminal justice system. Brown represented himself during his jury trial. Brown was offered water and given a break when he requested one. Brown was read his *Miranda* rights, acknowledged that he understood them and signed a written waiver of those rights.

{¶41} Brown contends that in spite of his valid waiver, he was coerced to confess because of statements that Detective George made during the interview. Specifically,

Brown argues that immediately after he claims he requested an attorney, Sergeant George states, "Listen, you want to know what you're going to be charged with?  If you decide that you're going to stop right now and not talk to us, you're going to be charged with murder, right?"  S.H. at 57.  [Appellant's Brief at 10].  Brown submits, "Despite Mr. Brown's age or previous experience with the justice system, threatening to charge someone with murder, and indicating that he could avoid the charge by waiving his right to remain silent impairs his capacity for self-determination.   Mr. Brown's will was overborne and his waiver of his *Miranda* rights was not voluntary."  Id.

{¶42}  Admonitions to tell the truth are not coercive in nature.  *State v. Jones*, 2nd Dist. Montgomery No. 26289, 2015–Ohio–4116, 43, 43 N.E.3d 833 N.E.3d 833, ¶ 19, *citing State v. Porter*, 178 Ohio App.3d 304, 2008–Ohio–4627, 897 N.E.2d 1149, ¶ 34 (2d Dist.); *State v. Loza*, 71 Ohio St.3d 61, 67, 641 N.E.2d 1082 (1994) ( "Admonitions to tell the truth are considered to be neither threats nor promises and are permissible."); *State v. Bradley*, 3rd Dist. Logan No. 8–95–15, 1996 WL 697946 (Dec. 5, 1996) ("Repeated requests to tell the truth do not constitute coercion so as to invalidate a confession."), *citing State v. Wiles*, 59 Ohio St.3d 71, 81, 571 N.E.2d 97 (1991); *State v. Western*, 2nd Dist. Montgomery No. 26058,  2015–Ohio–627, 29 N.E.3d 245 , ¶ 42 ("[a] police officer's assertion to the suspect that he or she is lying or that the suspect would not have another chance to tell his or her side of the story does not automatically render a confession involuntary"). Likewise, a police officer's statement to a suspect that a confession "will be helpful" or a police officer's offer to "help" the suspect if he confesses is "not improper" and does not "invalidate an otherwise legal confession."  *Jones,* 2015–Ohio–4116, ¶ 19, *citing State v. Stringham*, 2nd Dist. Miami No. 2002-CA-9, 2003–Ohio–1100,¶ 16 (officer's

attempt to "downplay the seriousness of the offense, by explaining that the situation might not be as bad as [defendant] thought" and statements that "the situation was not going away" and that defendant should tell the truth and " 'help' himself out of a bad situation" did not cause defendant's free will to be overborne or otherwise result in a coerced confession); *State v. Simms*, 10th Dist. Franklin No. 10AP–1063, 2012–Ohio–2321, ¶ 59 (where detectives "encourage[d] honesty, stating it could help [defendant]," detectives' actions "did not rise to the level of coercion"); *see also State v. Fouts*, 4th Dist. Washington No. 15CA25, 2016–Ohio–1104, ¶ 38–41 (concluding that there was nothing "improper" in officer's attempt to "create a favorable environment for a confession" by minimizing the offense as a "mistake" and the defendant's behavior as "iffy"; nothing in the officer's interview "approache[d] the level of conduct necessary to overcome [defendant's] will to remain silent" or "otherwise resulted in a coerced confession" where there was no "badgering" or threats by the officer, the "tone of the questioning was casual, conversational, and cooperative" and there was "no hint of coercion or duress during the interview"); *State v. Russell,* 2nd Dist. Clark No.2011–CA–10, 2012–Ohio–4316, ¶ 23 (detective's interrogation techniques and statements to defendant that he needed to "man up" and "take some lumps," i.e., tell the truth and take responsibility for his actions, were not inherently coercive tactics).

{¶43}  This record in the case at bar, including the video of Brown's interaction with the detectives does not support any allegation of police coercion, show of authority or intimidation.  Under the circumstances of the case at bar, we find the evidence supports the conclusion that Brown knowingly, intelligently and voluntary waived his *Miranda* rights

and his statements to the police were voluntarily given. Accordingly, the trial court did not err in overruling Brown's motion to suppress on that basis.

**{¶44}** Brown's First Assignment of Error is overruled.

II.

**{¶45}** In his Second Assignment of Error, Brown maintains there was insufficient evidence to convict him. Brown further argues that the jury's findings are against the manifest weight of the evidence.

**STANDARD OF APPELLATE REVIEW.**

*Sufficiency of the Evidence.*

**{¶46}** The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. __, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013); *Hurst v. Florida*, 136 S.Ct. 616, 621, 193 L.Ed.2d 504 (2016). The test for the sufficiency of the evidence involves a question of law for resolution by the appellate court. *State v. Walker,* 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶30. "This naturally entails a review of the elements of the charged offense and a review of the state's evidence." *State v. Richardson,* 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶13.

**{¶47}** When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus: *Walker,* at ¶30. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. *State v. Poutney,* 153 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶19. Thus, "on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001), *quoting Jenks* at paragraph two of the syllabus (emphasis added); *Walker* at ¶31. We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997); *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶74.

**ISSUE FOR APPEAL**

**A.   Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, "if believed, would convince the average mind of the defendant's guilt on each element of the crimes beyond a reasonable doubt."**

**{¶48}**   Brown admits that he stabbed Y.W. resulting in Y.W.'s death. Brown argues that the jury lost its way in not finding that he had acted in self-defense. [Appellant's Brief at 11-13].

**1. Self-defense - deadly force.**

**{¶49}**   Self-defense is a "confession and avoidance" affirmative defense in which appellant admits the elements of the crime but seeks to prove some additional element that absolves him of guilt. *State v. White*, 4th Dist. Ross No. 97 CA 2282, 1998 WL 2282 (Jan. 14, 1998). The affirmative defense of self-defense places the burden of proof on a

defendant by a preponderance of the evidence. *In re Collier*, 5th Dist. Richland No. 01 CA 5, 2001 WL 1011457 (Aug. 30, 2001), *citing State v. Caldwell*, 79 Ohio App.3d 667, 679, 607 N.E.2d 1096 (4th Dist. 1992).

{¶50} The elements of self-defense differ depending on whether the defendant used deadly or non-deadly force to defend himself. "Deadly force" means any force that carries a substantial risk that it will proximately result in the death of any person. R.C. 2901.01(A)(2).

> Courts have concluded that using even "a small knife on another person's body" constitutes "deadly force." [*State v. Densmore*, 3d Dist. Henry No. 7–08–04, 2009–Ohio–6870, ¶ 25], *citing Struthers v. Williams*, 7th Dist. Mahoning No. 07 MA 55, 2008–Ohio–6637, ¶ 13, *State v. Skinner*, 9th Dist. Lorain No. 06CA009023, 2007–Ohio–5601, ¶ 19, *State v. Sims*, 8th Dist. Cuyahoga No. 85608, 2005–Ohio–5846, ¶ 17, and *State v. Hansen*, 4th Dist. Athens No. 01CA15, 2002–Ohio–6135, ¶ 29. *See also State v. Harding*, 2d Dist. Montgomery No. 24062, 2011–Ohio–2823, ¶ 15 ("Stabbing a victim (or victims) with a knife constitutes the use of deadly force. * * * Consequently, to satisfy his burden, Harding had to meet the standard for self-defense through the use of deadly force."), *citing Sims* at ¶ 17, *Densmore* at ¶ 28, and *Hansen* ¶ 29.

*State v. Bagley*, 3rd Dist. Allen No. 1–13–31, 2014–Ohio–1787, ¶ 15. *Accord, State v. Melendez,* 8th Dist. Cuyahoga No. 97175, 2012–Ohio–2385, ¶ 27; *State v. Harding*, 2nd Dist. Montgomery No. 24062, 2011–Ohio–2823, ¶ 15; *State v. Keil,* 5th Dist. Richland No. 16CA28, 2017-Ohio-593, ¶ 37.

{¶51} In the case at bar, Brown used a filet knife with a 6-inch blade to stab Y.W. 1T. at 238. Consequently, to satisfy his burden of proof Brown had to meet the standard for self-defense using deadly force.

{¶52} To establish self-defense through the use of deadly force, "a defendant must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Barnes*, 94 Ohio St.3d 21, 24, 2002–Ohio–68, 759 N.E.2d 1240, *citing State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755(1979). "[T]he elements of self-defense are cumulative. * * * If the defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893(1986).

{¶53} As to the first self-defense element, i.e., whether Brown was at fault in creating the violent situation, Brown testified that he went to Y.W.'s home because he was concerned for his cousin, M.L. He contends that Y.W. did not have to come out from inside the house to confront him. Brown argues that M.L. testified that she never saw a knife. Brown contends that if he were holding a knife, it would be unlikely that Y.W. would have charged at him from the house. [Appellant' brief at 12].

{¶54} Regarding the second self-defense element, i.e., whether Brown had a bona fide belief that he was in imminent danger of death or great bodily harm, and the third element, i.e., the duty to retreat, we again note Brown's version of the altercation is

that Y.W. "sucker punched" him. He notes that Y.W. was four inches taller than Brown, as well as weighing over 200 pounds. Brown testified that Y.W. strangled him, preventing him from seeing clearly and breathing. [Appellant's brief at 12-13]. Brown contends that Y.W.'s threat to kill him coupled with Y.W.'s unprovoked violence gave rise to his bona fide belief that he was in imminent danger of death and his only means to escape was utilizing his knife.

{¶55} Brown's present argument is contingent on his assertion that he was the only credible witness at trial whose testimony matches the physical evidence supporting the claim of self-defense. However, we find the record supports the jury's decision.

{¶56} Rather than staying in the safety of his home after the altercation at the drive-thru, Brown walked to his house, and then left with a knife in his pocket and headed to confront Y.W. at Y.W.'s home. M. L. testified that Brown had been told to stay away from their home "because his drinking leads to violence." 1T at 187. M.L. testified that she never heard a knock on the door that day but, heard Brown outside hollering and screaming- "mother fucker."

{¶57} M.L. testified that Brown came up the steps with his hands in his pockets. Y.W. took a swing at Brown that missed. She then saw Y.W. fall to the ground. M.L. testified that when Y.W. walked back up the steps, he was bleeding like a faucet and said, "He stabbed me Bae" and fell. 1T. at 197. Then she heard Brown say "Yeah, Nigga" and then Brown calmly walked away.

{¶58} On his way home, Brown hid the knife in the bushes by his neighbor's house. Officers responding to Brown's 9-1-1 call, saw Brown, and observed that he fit the physical description of Y.W.'s assailant. The officers tried to talk with Brown, but

Brown put his head down and ran. The officers eventually cornered Brown and took him into custody. The arresting officers took photos of Brown's neck and abdomen and did not observe any physical injuries to his neck. The photographs were entered into evidence during trial. Brown did not tell the investigating officers that he had been strangled during his confrontation with Y.W.

{¶59} We hold that Brown concedes that the state met its burden of production regarding each element of the crimes of murder and felonious assault and, accordingly, there was sufficient evidence to submit the charge to the jury and to support Brown's conviction.

{¶60} Viewing the evidence in the case at bar in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Brown was not justified in the use of deadly force to defend himself from Y.W.

*Manifest weight of the evidence.*

{¶61} As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355; *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every

reasonable presumption must be made in favor of the judgment and the finding of facts.

* * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**{¶62}**  The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve.  *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy*, 4th Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶ 31. Because the trier of fact sees and hears the witnesses and is particularly competent to decide whether, and to what extent, to credit the testimony of particular witnesses, the appellate court must afford substantial deference to its determinations of credibility. *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010–Ohio–2420, 929 N.E.2d 1047, ¶ 20.  In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe."  *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002–Ohio–1152, at ¶ 13, citing *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999).  Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer,* 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶ 24.

**{¶63}** Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that " 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id.

**ISSUE FOR APPEAL.**

**B. Whether the jury court clearly lost their way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.**

**{¶64}** The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig,* 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP–1238, 2003–Ohio–2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the

same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997).

**{¶65}** In the case at bar, the jury heard the witnesses, viewed the evidence and heard Brown's statement to the police as well as Brown's arguments and explanations about his actions.  Thus, a rational basis exists in the record for the jury's decision.

**{¶66}** We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.  Based upon the foregoing and the entire record in this matter we find Brown's convictions are not against the sufficiency or the manifest weight of the evidence.  To the contrary, the jury appears to have fairly and impartially decided the matters before them.  The jury heard the witnesses, evaluated the evidence, and was convinced of Brown's guilt.

**{¶67}** The jury neither lost their way nor created a miscarriage of justice in rejecting Brown's theory of self-defense after hearing the evidence.  The jury did not clearly lose its way and create a manifest miscarriage of justice requiring that Brown's conviction for the murder of Y.W. be reversed and a new trial ordered.

**{¶68}** Brown's Second Assignments of Error is overruled.

{¶69} The judgment of the Stark County Court of Common Pleas is affirmed.

By Gwin, P.J.,

Hoffman, J., and

Delaney, J., concur